2013-1628

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

PRESIDENT AND FELLOWS OF HARVARD COLLEGE,

*Plaintiff-Appellant,*

and

E. I. DUPONT DE NEMOURS AND COMPANY,

*Plaintiff-Appellant,*

v.

Teresa Stanek Rea, ACTING DIRECTOR,
UNITED STATES PATENT AND TRADEMARK OFFICE,

*Defendant-Appellee.*

**Appeal from the United States District Court for the Eastern District of Virginia
in case no. 12-CV-1034, Judge Liam O'Grady.**

## BRIEF FOR PLAINTIFFS-APPELLANTS

Christopher B. Mead
LONDON & MEAD
1225 19th Street, NW
Suite 320
Washington, DC  20009
(202) 331-3334

*Attorney for Plaintiff-Appellant
President and Fellows of Harvard College*

Donald R. Dunner
Ronald A. Bleeker
Andrew J. Vance
FINNEGAN, HENDERSON, FARABOW,
   GARRETT & DUNNER, L.L.P.
901 New York Avenue, NW
Washington, DC  20001
(202) 408-4000

*Attorneys for Plaintiff-Appellant
E. I. du Pont de Nemours and
Company*

January 6, 2014

# CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant E. I. du Pont de Nemours and Company certify the following:

1. The full name of every party or amicus represented by us is:

   E. I. du Pont de Nemours and Company

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

   E. I. du Pont de Nemours and Company

3. All parent corporations and any publicly held companies that own 10% or more of the stock of any party represented by us are:

   None.

4. The names of all law firms and the partners or associates that appeared for the parties now represented by us in the trial court or are expected to appear in this court are:

   **MILLER & CHEVALIER CHARTERED**
   Charles F.B. McAleer , Jr.

   **WOODCOCK WASHBURN**
   Joseph Lucci

   **FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP**
   Donald R. Dunner, Ronald A. Bleeker, Andrew J. Vance

# CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant President and Fellows of Harvard College certify the following:

1.  The full name of every party or amicus represented by us is:

    President and Fellows of Harvard College

2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

    President and Fellows of Harvard College

3.  All parent corporations and any publicly held companies that own 10% or more of the stock of any party represented by us are:

    None.

4.  The names of all law firms and the partners or associates that appeared for the parties now represented by us in the trial court or are expected to appear in this court are:

    **MILLER & CHEVALIER CHARTERED**
    Charles F.B. McAleer, Jr.

    **WOODCOCK WASHBURN**
    Joseph Lucci

    **London & Mead**
    Christopher B. Mead

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST.................................................................................... i

TABLE OF AUTHORITIES .....................................................................................v

STATEMENT OF RELATED CASES ................................................................. viii

I.    STATEMENT OF JURISDICTION ...................................................1

II.   STATEMENT OF THE ISSUES ........................................................1

III.  STATEMENT OF THE CASE ...........................................................2

    A.    Preliminary Statement ...........................................................2

    B.    Course of Proceedings and Disposition Below .....................4

IV.   STATEMENT OF FACTS ..................................................................5

    A.    Overview of the "Harvard Mouse" Inventions .....................5

    B.    Prosecution of the "Harvard Mouse" Patents.......................7

        1.    U.S. Patent No. 4,736,866.........................................7

        2.    U.S. Patent No. 5,087,571.........................................8

        3.    U.S. Patent No. 5,925,803.......................................14

    C.    The *Ex Parte* Reexamination of the '803 Patent................16

    D.    The APA Action....................................................................20

        1.    The Parties' Arguments ...........................................20

        2.    The District Court's Summary Judgment Decision..................23

V.    SUMMARY OF THE ARGUMENT....................................................25

VI.   ARGUMENT......................................................................................27

    A.    Standard of Review ..............................................................27

iii

B.    The district court erred by holding that the PTO's finding that Harvard paid the statutory fee required for a terminal disclaimer was not arbitrary and capricious..................................................28

    1.    A terminal disclaimer is not effective unless the patent applicant pays the statutory fee..................................................28

    2.    The PTO abused its discretion by finding that Harvard paid the statutory fee required for a terminal disclaimer..........29

C.    The district court abused its discretion by applying laches. ...............39

    1.    Standard for Laches ..................................................39

    2.    Harvard did not delay taking appropriate action for an unreasonable and inexcusable length of time. .........................40

VII.    CONCLUSION..................................................41

# TABLE OF AUTHORITIES

**Page(s)**

FEDERAL CASES

*A.C. Aukerman Co. v. R.L. Chaides Const. Co.*,
960 F.2d 1020 (Fed. Cir. 1992) ...................................................28, 39

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
419 U.S. 281 (1974).....................................................................27, 37

*Boyden v. Comm'n of Patents*,
441 F.2d 1041 (D.C. Cir. 1971) ...................................................29, 39

*Bristol-Meyers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*,
326 F.3d 1226 (Fed. Cir. 2003) ...........................................................38

*Burandt v. Dudas*,
528 F.3d 1329 (Fed. Cir. 2008) ...................................................27, 36

*In re Hubbell*,
709 F.3d 1140 (Fed. Cir. 2013) ...........................................................15

*In re Yamazaki*,
702 F.3d 1327 (Fed. Cir. 2012) ...........................................................41

*Pei-Herng Hor v. Ching-Wu Chu*,
699 F.3d 1331 (Fed. Cir. 2012) ...........................................................27

*Simmons v. Block*,
782 F.2d 1545 (11th Cir. 1986) ...........................................................34

*Star Fruits S.N.C. v. U.S.*,
393 F.3d 1277 (Fed. Cir. 2005) ...........................................................27

*U.S. v. Chem. Found., Inc.*,
272 U.S. 1 (1926).................................................................................31

*U.S. v. Heffner*,
420 F.2d 809 (4th Cir. 1969) ...............................................................34

*Vectra Fitness, Inc. v. TNWK Corp.*,
162 F.3d 1379 (Fed. Cir. 1998) ...........................................29, 31, 39

**FEDERAL STATUTES**

5 U.S.C. § 701 (2011) ...................................................................1

5 U.S.C. § 702 (1976) ...................................................................1

5 U.S.C. § 703 (1976) ...................................................................1

5 U.S.C. § 704 (1966) ...................................................................1

5 U.S.C. § 705 (1966) ...................................................................1

5 U.S.C. § 706 (1966) ...............................................................1, 20

28 U.S.C. § 1295 (2011) ...............................................................1

28 U.S.C. § 1331 (1980) ...............................................................1

28 U.S.C. § 1338 (2011) ...............................................................1

28 U.S.C. § 1361 (1962) ...............................................................1

28 U.S.C. § 2201 (2010) ...............................................................1

35 U.S.C. § 253 (1975) ................................................................28

**REGULATIONS**

37 C.F.R. § 1.6 (1989) .............................................................12, 32

37 C.F.R. § 1.16 (1990) ...............................................................11

37 C.F.R. § 1.20 (1989) .......................................................9, 11 12, 34

37 C.F.R. § 1.25 (1989) .......................................................10, 19, 20

37 C.F.R. § 1.97 (2013) .........................................................22, 37

37 C.F.R. § 1.321 (1992) ........................................................14, 33

37 C.F.R. § 1.321 (1999) ...............................................................16

37 C.F.R. § 1.321 (1989) ..............................................................29

## OTHER AUTHORITIES

MPEP § 509.01 (5th ed. Rev. 11, Apr. 1989).......................................12, 34

MPEP § 714.17 (5th ed. Rev. 6, Oct. 1987) ........................................22, 37

MPEP § 717.01 (5th ed. Rev. 6, Oct. 1987) ........................................12, 32

MPEP § 719.01 (8th ed. Rev. 9, Aug. 2012) .......................................12, 32

MPEP § 2701 (8th ed. Rev. 9, Aug. 2012) ..........................................14, 33

## STATEMENT OF RELATED CASES

This Court has not previously heard any other appeal in or from the same civil action or proceeding in the lower court.  Counsel for Appellants are not aware of any case pending in this Court or any other courts that will directly affect or be directly affected by this Court's decision in this appeal.

## I. STATEMENT OF JURISDICTION

The lower court had subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338(a), 1361, and 2201, and 5 U.S.C. §§ 701-706. This Court has exclusive jurisdiction to decide the appeal pursuant to 28 U.S.C. § 1295(a)(1).

## II. STATEMENT OF THE ISSUES

1. Whether the district court erred by affirming the decision of the U.S. Patent and Trademark Office ("PTO") to deny entry of new claims proposed by the President and Fellows of Harvard College ("Harvard") during reexamination of U.S. Patent No. 5,925,803 on the ground that the patent had expired in view of a terminal disclaimer submitted during prosecution of its parent application, where overwhelming, unrefuted evidence showed that the terminal disclaimer was not legally effective and valid because Harvard did not pay the fee required by statute such that the PTO's finding to the contrary was arbitrary and capricious.

2. Whether the district court erred by applying laches based on Harvard's timing in addressing the terminal disclaimer issue, where Harvard had no reason or mechanism to take any action until the issue arose during reexamination of the '803 patent, and where Harvard took prompt steps thereafter to address the issue by petitioning the PTO and filing this action.

III. **STATEMENT OF THE CASE**

   A. **Preliminary Statement**

In order to create an effective and valid terminal disclaimer, the Patent Act requires submission of a written disclaimer document that meets certain requirements and payment of the fee required by statute. The validity of a terminal disclaimer does not depend on actions taken by the PTO, but the patent applicant must satisfy each of these statutory requirements, including payment of the fee. The PTO lacks discretion to waive payment of the fee required by statute.

During prosecution of the second of its three patents for its "Harvard mouse" invention, Harvard received an office action rejecting the application on multiple grounds, including obviousness-type double patenting. Harvard inadvertently failed to respond to the office action within the required time and later petitioned the PTO to revive its application. Along with its petition, Harvard submitted a number of papers in response to the office action, including a terminal disclaimer which, if effective, would shorten the term of Harvard's second and third patents. While Harvard's disclaimer included language stating that the fee was enclosed, the evidence is clear that Harvard failed to pay the required disclaimer fee. Accordingly, the disclaimer did not comply with the statutory requirements and thus was never effective and valid.

2

The PTO never noted the terminal disclaimer with any confirmation of receipt of payment, as it did with every other paper in the file that enclosed a fee payment. Nor did the PTO identify the disclaimer on the "Contents" page of the file wrapper or give it a date stamp or paper number, in accordance with its policies and procedures. And none of the "Harvard mouse" patents makes any reference to the terminal disclaimer. Significantly, the prosecution history of the third "Harvard mouse" patent—the patent at issue here—makes no reference to double patenting or to the previously filed disclaimer. In addition, during prosecution of the third "Harvard mouse" patent, the PTO examiner who withdrew the double patenting rejection in essence indicated that there was no need for a terminal disclaimer by asserting that the claims involved in the double patenting rejection were patentably distinct, which precluded a double patenting rejection.

In 2010, during a reexamination of Harvard's third patent, the PTO refused to allow Harvard to add new claims on the ground that the patent had expired in 2005 in view of the terminal disclaimer submitted without a fee payment during prosecution of the second patent. Without any actual evidence to support its decision, the PTO found that Harvard had paid the disclaimer fee simply because the disclaimer stated that the fee was enclosed and the disclaimer was in the file wrapper. The PTO also relied on a general authorization by Harvard's attorney that "any fees" could be charged to his deposit account, even though the PTO's

3

written policy precludes such charges for disclaimer fees and there is no evidence the PTO did so.

The PTO's decision was arbitrary and capricious in view of the overwhelming, unrefuted evidence that Harvard did not pay the disclaimer fee, including declarations by Harvard's prosecuting law firm that it did not believe it submitted a check to the PTO for the disclaimer fee and the missing notations in the PTO's file wrapper described above, such as the PTO's failure to note receipt of the fee on the disclaimer. Given the record, the PTO had no discretion to find that Harvard paid the fee required to create an effective and valid terminal disclaimer. Accordingly, the district court erred by refusing to hold that the PTO's decision was arbitrary and capricious.

The district court also erred by applying laches on the ground that Harvard waited too long to address the terminal disclaimer issue. Harvard addressed the issue promptly, as soon as it arose during the reexamination proceeding. And Harvard had no reason or mechanism to take action any earlier. Under such circumstances, the court abused its discretion by applying laches to bar Harvard from showing that the terminal disclaimer was ineffective and invalid.

### B.    Course of Proceedings and Disposition Below

This appeal involves an action under the Administrative Procedure Act filed by Appellants Harvard and E. I. du Pont de Nemours and Company ("DuPont") to

challenge an arbitrary and capricious decision by the PTO, refusing to enter new

claims during a reexamination proceeding for U.S. Patent No. 5,925,803 on the

ground that the term of this patent expired in 2005 in view of a terminal disclaimer

filed during prosecution of its parent application.  A4.  Harvard owns the '803

patent and DuPont is its exclusive licensee.  A5381 at ¶¶ 13-14.

The parties filed cross-motions for summary judgment.  A4.  On May 15,

2013, the district court granted judgment for the PTO, holding that the PTO's

decision was not arbitrary or capricious.  A13.  Appellants timely filed this appeal

thereafter.  A26.

## IV.    STATEMENT OF FACTS

### A.    Overview of the "Harvard Mouse" Inventions

On June 22, 1984, Philip Leder and Timothy Stewart filed a patent

application, which they assigned to Harvard, describing their inventions related to

"a transgenic non-human eukaryotic animal (preferably a rodent such as a mouse)

whose germ cells and somatic cells contain an activated oncogene sequence

introduced into the animal …"  A33, col. 1:35-39.  Describing their invention, they

explained that "[a]n activated oncogene sequence … means an oncogene which,

when incorporated into the genome of the animal, increases the probability of the

development of neoplasms (particularly malignant tumors) in the animal."  *Id.* at

col. 1:41-45. In other words, Leder and Stewart invented a new research animal that is highly susceptible to developing cancer.

As explained in their application, "[t]he animals of the invention can be used to test a material suspected of being a carcinogen, by exposing the animal to the material and determining neoplastic growth as an indicator of carcinogenicity." A34, col. 3:24-27. Because the animals have such a high propensity to develop cancer, their use in cancer studies permits "suspect materials to be tested in much smaller amounts than the amounts used in [prior] animal carcinogenicity studies … ." *Id.* at col. 3:29-31. Moreover, "the animals will be expected to develop tumors much sooner because they already contain an activated oncogene," which increases the speed of the study. *Id.* at col. 3:36-38. The invention was commercialized as a mouse, which became known as the "Harvard mouse"[1] and the "OncoMouse®." A5057.[2]

---

[1] Appellants commercialized several different mice using the patented technology.

[2] Appellants do not charge licensing fees to academic institutions or other not-for-profit organizations conducting cancer research. As explained on Harvard's website, "[i]n the case of exclusive licenses, Harvard will retain the right, for itself and other not-for profit research organizations, to practice the subject matter of the patent rights for internal research, teaching and other educational purposes." *See* www.otd.harvard.edu/resources/guidelines/license. Appellants request that the Court take judicial notice of this fact publicly available on Harvard's website.

## B.     Prosecution of the "Harvard Mouse" Patents

Based on Leder and Stewart's original application, Harvard obtained three U.S. patents directed to their inventions related to the Harvard Mouse:  U.S. Patent Nos. 4,736,866, 5,087,571, and 5,925,803.

### 1.     U.S. Patent No. 4,736,866

Harvard's original application included claims directed to the following inventions by Leder and Stewart:  (1) the novel research animal itself, (2) a method of providing a cell culture using the research animal, (3) certain plasmids deposited in the American Type Culture Collection, (4) a method of testing a material suspected of being a carcinogen, (5) a method of testing a material suspected of conferring protection against the development of neoplasms, and (6) a method of producing the research animal.  A5119-21.  Harvard's original application ultimately issued as U.S. Patent No. 4,736,866 on April 12, 1988, with claims directed to the research animal, namely a "transgenic non-human mammal all of whose germ cells and somatic cells contain a recombinant activated oncogene sequence introduced into said mammal, or an ancestor of said mammal, at an embryonic stage."  A5363, 5370.  The '866 patent had a seventeen-year term that ended on April 12, 2005.  A4-5.  The details of the prosecution history of the '866 patent are not pertinent to this appeal.

## 2.    U.S. Patent No. 5,087,571

Several years after the filing of the original application, on March 22, 1988, Harvard filed a second application as a divisional of the original, the divisional ultimately issuing on February 11, 1992, as U.S. Patent No. 5,087,571.  A5353. The '571 patent has one claim directed to a method of providing a cell culture from a somatic cell of a transgenic non-human mammal and another claim directed to a cell derived from a somatic cell obtained from the transgenic non-human mammal. A5360, col. 10:12-25.

During prosecution of the '571 patent, the PTO issued a first office action, rejecting the claims then pending in the application on several grounds, including obviousness-type double patenting in view of the claims of the '866 patent. A5372-76.  At the time of the double patenting rejection, the '571 application included claims directed to the methods and plasmids of inventions (2)-(6) described above, but not to the research animal.  A5111-14, 5372.  Harvard did not respond to the first office action within the required time, and the PTO accordingly issued a notice that the application had been abandoned.  A5362.

After realizing that the application was abandoned, however, Harvard filed a petition to revive it on the ground that the abandonment was unintentional.  A1222. Along with the petition, Harvard filed a response to the office action, a Rule 132 declaration by the inventor, and a terminal disclaimer.  A1223-35, 1271-72.

To cover the fee for the petition to revive, Harvard submitted a check for $620.00. A1222. Additionally, at the end of the response, Harvard included a generalized authorization that the PTO could "charge any fees" to Harvard's attorney's deposit account. A1230.

The terminal disclaimer contained unconventional language[3] disclaiming the portion of the term "of any patent granted on the above-identified application *or on any application which is entitled to the benefit of the filing date of this application under 35 U.S.C. § 120*" that extends beyond the term of the '866 patent. A1271. In view of the italicized language, the terminal disclaimer purported to address continuation applications that may be filed in the future.

The terminal disclaimer also contained language stating that it was accompanied by "the fee set forth in 37 C.F.R. § 1.20(d)" (the terminal disclaimer fee). A1272. But the file wrapper for the '571 patent does not indicate that the PTO ever received the statutory disclaimer fee. For example, the PTO did not note receipt of the fee payment on the terminal disclaimer or elsewhere in the file—by check or deposit account—even though the PTO's regular practice was to do so. A5116-17, 5361-62. In accordance with the PTO's regular practice, for all other papers where Harvard paid a fee, the PTO noted receipt of the payment on the face

---

[3] The PTO's standard form for a terminal disclaimer does not reference later-filed applications that claim the same priority date like the language used in the disclaimer at issue here. A5-6.

of the paper.  Indeed, for the petition to revive, filed on the same day as the

disclaimer, the PTO noted the enclosed fee payment of $620.00 by check (CK) on

the face of the petition:

Respectfully Submitted,

Paul T. Clark
Reg. No. 30,162
Attorney for Applicants

Fish & Richardson
One Financial Center
Boston, MA 02111-2658
Tel.: (617) 542-5070

080  11/29/89  Date: November 15, 1989

1 141  620.00 CK

I hereby certify that this correspondence is being
deposited with the United States Postal Service
first class mail in an envelope addressed to: Commis-
sioner of Patents and Trademarks, Washington, D.C.
20231, ON Nov. 16, 1989
M. Silver

A1222 (emphasis added).  In a similar manner, the PTO noted payment of the

required fee accompanying the application transmittal filed March 22, 1988

(A5392-98), the petition for extension of time filed December 21, 1990 (A5391),

the petition for extension of time filed June 27, 1991 (A5390), and the issue fee

transmittal filed November 12, 1991 (A5389).[4]

The PTO rules provide for a general authorization to charge "all fees" to a

deposit account.  37 C.F.R. § 1.25 (1989) ("A general authorization to charge all

---

[4] Appellants request that the Court take judicial notice of these documents from the
prosecution history of the '571 patent.

fees … to a deposit account containing sufficient funds may be filed in an

individual application … .").  While Harvard's response to the office action

contained a general authorization to "charge any fees" to its attorney's deposit

account, there is no evidence that the PTO did so for the terminal disclaimer.

Specifically, the PTO did not note a charge to the deposit account on the terminal

disclaimer, which was its regular practice for documenting deposit account charges

at that time.[5]  *See*, *e.g.*, A5387-88 (showing notation of a fee payment by deposit

account charge).  Indeed, as explained in the version of the Manual of Patent

Examiner Procedure in effect at that time, the PTO's stated policy was <u>not</u> to

charge deposit accounts for certain fees, such as the terminal disclaimer fee

specified in 37 C.F.R. § 1.20, based on the type of general authorization provided

in Harvard's response:

---

[5] Appellants request that the Court take judicial notice of a paper filed during prosecution of U.S. Patent No. 5,110,126, which shows how the PTO noted a charge to a deposit account at the relevant time.  Specifically, in this example, a transmittal letter dated March 16, 1990, requested the filing of a continuation application, but did not include a fee payment of $120 for the multiple dependent claims in the application required by 37 C.F.R. § 1.16(d).  Accordingly, the PTO charged $120 to the attorney's deposit account and clearly noted the charge on the face of the transmittal letter based on the attorney's general authorization to charge "any fees due under 37 CFR 1.16 and 1.17 which may be required" to his deposit account.  *See* A5387 (deposit account no. "06-0916" and "120.00CH").

11

**Fees under >37 CFR< 1.19, 1.20[6] and 1.21 will not be charged [to a deposit account] as a result of a general authorization under >37 CFR<1.25.** It is recommended that authorizations to charge fees to deposit accounts include reference to the particular fees or fee sections of the rules which applicant intends to authorize.

MPEP § 509.01 (5th ed. Rev. 11, Apr. 1989). The record reflects that the PTO followed its stated regular practice and did not charge the deposit account.

The PTO also failed to record entry of the terminal disclaimer in the official record by identifying it on the "Contents" page of the file wrapper or by giving it a paper number, as the MPEP specifies for papers legally entered into the record. A5361-62; MPEP § 717.01 (5th ed. Rev. 6, Oct. 1987) ("Papers that do not become a permanent part of the record should not be entered on the 'Contents' of the file wrapper."); MPEP § 719.01 (8th ed. Rev. 9, Aug. 2012) ("All papers legally entered on the 'Contents' of the file wrapper are given a paper number."). Moreover, the PTO did not apply a date stamp to the terminal disclaimer either, as its regulations specify for papers received by the PTO. A1271-72; 37 C.F.R. § 1.6 (1989) ("Letters and other papers received in the Patent and Trademark Office are stamped with the date of receipt"). Accordingly, while the PTO placed a copy of

---

[6] While the title of 37 C.F.R. § 1.20 is "Post issuance fees," the fees specified in § 1.20(d) cover statutory disclaimers (including terminal disclaimers submitted in response to double patenting rejections during prosecution), such that § 1.20 obviously relates to both pre-issuance and post-issuance fees.

the terminal disclaimer in the file wrapper, the PTO did not take the actions

specified in the MPEP to enter it into the official record.

Several weeks after receiving Harvard's petition to revive and its response to

the office action, the PTO granted Harvard's petition and assigned the application

to a new examiner.  Six months later, the new examiner issued a second office

action that withdrew the rejections of the first examiner in view of Harvard's

"arguments, amendments to the claims and the Rule 132 Declaration by Philip

Leder" filed on December 29, 1989:

> The rejections of record of claims 13-19, newly
> amended, as set forth on pages 2-5 of the last Office
> action, is withdrawn in view of Applicants' arguments,
> amendments to the claims and the Rule 132 Declaration
> by Philip Leder, all filed on December 29, 1989.

A5347.  While the arguments in Harvard's response made reference to the filing of

the terminal disclaimer, the new examiner did not identify the terminal disclaimer

as the reason for withdrawing the double patenting rejection or indicate that it was

entered into the record.  Indeed, the file wrapper contains no indication that the

new examiner ever received or reviewed the terminal disclaimer.  Moreover, as

discussed below, later statements by the second examiner suggest that she would

not have required a terminal disclaimer to withdraw the double patenting rejection.

*See infra* at 15-16.

13

Consistent with the PTO's failure to take the actions specified in the MPEP for entering a terminal disclaimer into the record, the PTO's publication of the '571 patent contains no reference to the terminal disclaimer, even though it was the PTO's regular practice at that time to identify a legally effective terminal disclaimer on the face of the patent. *See* MPEP § 2701 (8th ed. Rev. 2, May 2012) ("Before June 8, 1995, the terminal disclaimer date was printed on the face of the patent"); 37 C.F.R. § 1.321 (1992) ("A notice of disclaimer is … attached to the printed copies of the specification.").

### 3. U.S. Patent No. 5,925,803

Several months before issuance of the '571 patent, on September 9, 1991, Harvard filed a third application as a continuation of the second, this third application ultimately issuing on July 20, 1999, as U.S. Patent No. 5,925,803. A30. The '803 patent includes claims directed to a method of testing a material suspected of being a carcinogen and to a method of testing a material suspected of conferring protection against the development of neoplasms. A37. The '803 patent is entitled to a seventeen-year term from issuance, which would extend to July 20, 2016, and its expiration date is the principal issue on appeal, namely whether the terminal disclaimer shortens its term.

During prosecution of the '803 patent, the PTO assigned the application to the same examiner who took over prosecution of the '571 patent and withdrew the

14

double patenting rejection without identifying the terminal disclaimer as the reason for withdrawing the rejection. *See* A5346 and 5350 (Examiner Chambers). The same examiner never applied a double patenting rejection to any of the claims during prosecution of the '803 patent. Indeed, to the contrary, she took actions that suggest that she disagreed with the double patenting rejection applied by the first examiner of the '571 application and that she would have withdrawn it without a terminal disclaimer, since she concluded that the inventions claimed in '866 patent and in the '571 application were patentably distinct from each other. More particularly, during prosecution of the '803 application, the examiner applied a restriction requirement to several groupings of claims, including claims directed to the same subject matter as the claims of the '866 patent and to the same subject matter as the claims pending in the '571 application at the time of the double patenting rejection. A5351-52. In the restriction requirement, the examiner asserted that these "inventions are distinct, each from the other" and that they "have acquired a separate status in the art because of their divergent subject matter … ." *Id.*

Given the examiner's conclusion that these inventions were patentably distinct, of course, she never would have applied a double patenting rejection to the claims of '571 application in the first place. Indeed, under such circumstances, a double patenting rejection was precluded by law. *In re Hubbell*, 709 F.3d 1140,

1145 (Fed. Cir. 2013) (holding obviousness-type double patenting "prohibits the issuance of claims in a second patent that are not 'patentably distinct from the claims of the first patent.'") (citation omitted).

The file wrapper of the '803 patent contains no reference to the terminal disclaimer submitted during prosecution of the '571 patent or to any other disclaimer. Additionally, the '803 patent itself contains no indication that its term is limited by a terminal disclaimer either, as required by 37 C.F.R. § 1.321 (1999). *Id.* ("A notice of disclaimer is … attached to the printed copies of the specification.").

## C. The *Ex Parte* Reexamination of the '803 Patent

More than a decade after issuance of the '803 patent, on April 20, 2010, a third party requested *ex parte* reexamination of the '803 patent based on obviousness-type double patenting in view of the '866 patent and based on prior art. A5009. In its reexamination request, the third party asserted that the '803 patent had expired based on the terminal disclaimer filed during prosecution of the '571 patent since it claimed the benefit of the filing date of the '571 patent (A5019-20), notwithstanding that the terminal disclaimer was not referenced in the file wrapper of the '803 patent or on its face, and the PTO had never applied a double patenting rejection during prosecution of the '803 patent.

16

In response to the third party's request, the PTO examiner agreed to reexamine the '803 patent and rejected the claims on double patenting grounds in view of the '866 patent and prior art. A5184-86, 5198-203. The PTO examiner also adopted the requester's argument that the '803 patent had expired based on the terminal disclaimer filed during prosecution of the '571 patent. A5199-200. In response to the PTO's rejection, Harvard filed an amendment adding several new claims and arguing that the '803 patent had not expired based on the terminal disclaimer and that the double patenting rejection was improper. A5206-15.

In the next office action, the PTO examiner withdrew the claim rejections and issued a notice of intent to issue a reexamination certificate for the original claims of the '803 patent, but refused to allow Harvard to add new claims on the ground that the '803 patent had expired based on the terminal disclaimer filed during prosecution of the '571 patent. A5220-32. Harvard responded by filing a petition to the PTO Director, challenging the examiner's refusal to enter the new claims. A5233-36. In the petition, Harvard argued that the terminal disclaimer did not apply because it was not legally entered into the file of the '571 patent. A5234.

In support of its petition, Harvard filed declarations by the employees of the firm that handled prosecution of the '571 patent, Fish & Richardson, providing affirmative evidence that Harvard did not pay the statutory fee required for a legally effective terminal disclaimer. A5238-46, 5249-50. Specifically, Harvard

17

filed a declaration by Paul T. Clark, the attorney who handled prosecution of the

'571 patent, explaining that his prosecution file did not contain a photocopy of a

check for the terminal disclaimer and that it was his standard practice to place a

photocopy of all checks sent to the PTO in his file. A5249-50. Based on his

review of the file, Mr. Clark testified that he believed that he had failed to pay the

statutory fee notwithstanding the statement in the terminal disclaimer to the

contrary. A5250. Harvard also submitted a declaration by Timothy McGaughey,

Fish & Richardson's Controller, asserting that he checked Fish & Richardson's

canceled checks during the relevant time and did not find any evidence that the

PTO had cashed a check for the disclaimer. A5245-46.

The PTO denied Harvard's petition as untimely, asserting that Harvard did

not raise this argument before the examiner. A5314-16. Thereafter, Harvard filed

a petition to seek reconsideration of the decision, asserting that its argument

concerning the fee payment was timely and that it required reversal of the

examiner's refusal to enter the new claims. A5317-33.

On June 14, 2012, the PTO Director denied Harvard's request for

reconsideration. A5336-42. While reversing the decision that Harvard's petition

was untimely as to the relevant issue, the PTO Director upheld the examiner's

refusal to allow new claims based on the determination that the '803 patent had

expired in view of the terminal disclaimer filed during prosecution of the '571

patent. A5338-42. Despite overwhelming evidence showing that Harvard had not paid the fee required for an effective, legally valid terminal disclaimer—the evidence from the PTO's own file wrapper and Harvard's unrefuted declarations described above—the PTO Director held that the terminal disclaimer was effective and that Harvard had paid the required fee because: (1) the terminal disclaimer indicates that it was accompanied by a fee; and (2) the response filed on the same date referenced the terminal disclaimer and included a general authorization to pay any fees by debiting the deposit account. A5340-41.

The PTO Director did not cite any evidence that the PTO actually received payment of the statutory fee and did not reconcile his reliance on Harvard's general authorization to charge "any fees" to its attorney's deposit account with the PTO's stated policy that it did not charge disclaimer fees to a deposit account based on that type of general authorization. *Supra* at 11-12 ("Fees under >37 CFR< 1.19, 1.20 and 1.21 will not be charged [to a deposit account] as a result of a general authorization under >37 CFR<1.25."). While the PTO Director incorrectly characterized Harvard's general authorization to charge "any fees" to the deposit account as a specific authorization to charge the disclaimer fee because the disclaimer was mentioned in Harvard's response containing the general authorization (A5340-41), the PTO rule providing for general authorizations, 37 C.F.R. § 1.25 (1989), does not say that a general authorization becomes a specific

authorization simply because it appears in a document that mentions another document that requires a fee. In mischaracterizing Harvard's general authorization as a specific authorization, the PTO director attempted to rewrite the general authorization rule in 37 C.F.R. § 1.25 (1989) without any support in the text of the rule, in the case law, or even in logic. Additionally, without citing relevant authority, the PTO Director concluded that the disclaimer was effective even if Harvard did not pay the required fee. A5341.

### D.    The APA Action

On September 14, 2012, Appellants filed an action under the Administrative Procedure Act to challenge the PTO's refusal to enter the new claims on the ground that the '803 patent was expired, arguing that the PTO's decision was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law under 5 U.S.C. § 706(2)(A). A5382-86. In view of the limited record of an APA action, the parties filed cross-motions for summary judgment. A4.

### 1.    The Parties' Arguments

Appellants principally argued that (i) the terminal disclaimer was ineffective because Harvard did not satisfy the statutory requirement to pay the disclaimer fee and (ii) the PTO's determination to the contrary was arbitrary and capricious because it disregarded the overwhelming, unrefuted evidence explained above showing that the fee was never paid. A10, 1017-18, 1339-47. In response, the

PTO argued that its determination was not arbitrary or capricious for the same reasons asserted by the Director, namely that Harvard's terminal disclaimer included language stating that the fee was enclosed and that Harvard's response included a general statement that any fees could be charged to the prosecution attorney's deposit account. A1311, 1317-19. The PTO also argued that the examiner had relied on the terminal disclaimer as the reason for withdrawing the double patenting rejection because she withdrew the multiple claim rejections "in view of Applicant's arguments" referencing the terminal disclaimer (A1316-17), even though the examiner never identified the terminal disclaimer as the reason for withdrawing the double patenting rejection and later took actions indicating that she disagreed with it, namely she stated that the claimed inventions were patentably distinct from each other (*supra* at 13-15).

While failing to point to any evidence that Harvard actually paid the statutory fee, either by check or deposit account charge, the PTO relied on the "presumption of regularity" doctrine, arguing that there is a presumption that Harvard paid the terminal disclaimer fee because the PTO "received, recorded, and docketed the terminal disclaimer without any mention of a missing payment," and that it would not have done so unless the fee was paid. A1318. In other words, the PTO effectively argued that by merely placing the terminal disclaimer in the file

wrapper, the PTO could find that it had legally entered the disclaimer into the record and confirmed receipt of the statutory fee.

But the PTO failed to explain how such a finding could be reconciled with its failure to provide a notation of the alleged fee payment on the terminal disclaimer, despite its regular practice of noting payment of required fees on all other papers in the file wrapper. *Supra* at 9-10. And the PTO did not reconcile its finding with its failure to identify the terminal disclaimer on the "Contents" page of the file wrapper or its failure to give the terminal disclaimer a paper number and a date stamp, despite the PTO's regular practice of doing so for all papers legally entered into the record. *Supra* at 12-13. Additionally, the PTO did not explain how its finding could be reconciled with its regular practice of placing a paper in the file wrapper, even if the paper had not been legally entered into the record or if the required fee had not been paid. *See, e.g.,* MPEP § 714.17 (5th ed. Rev. 6, Oct. 1987) ("When an application is not prosecuted within the period set for response and thereafter an amendment is filed without a petition for extension of time and fee pursuant to 37 CFR 1.136(a), such amendment shall be endorsed on the file wrapper of the application, but not formally entered."); *see also* 37 C.F.R. § 1.97(i) (2013) (noting that an information disclosure statement that does not comply with the regulations, such as an information disclosure statement that is not

accompanied by the required fee, "will be placed in the file but will not be considered by the Office.").

Finally, as a fallback position, the PTO argued that laches should bar Harvard's APA action even if the statutory fee was not paid. Specifically, the PTO asserted that Harvard should have addressed the terminal disclaimer issue earlier than the APA action (A1319), though the PTO did not identify what action Harvard allegedly should have taken to do so. In response to the PTO's laches defense, Appellants argued that Harvard had acted promptly as soon as it received notice in the reexamination that the PTO had determined that the terminal disclaimer applied to the '803 patent. A13, 1379-81, 1409-11. Appellants also argued that the disclaimer was not referenced in the file wrapper of the '803 patent and that it was readily apparent to the public that the disclaimer had not been officially entered into the file wrapper of the '571 patent. *See* A1379-81.

### 2. The District Court's Summary Judgment Decision

The district court granted summary judgment in favor of the PTO. The court found that "[i]t is undisputed that Harvard intentionally filed the terminal disclaimer in writing and that it was effectively recorded [i.e., placed in the file wrapper][7] by the USPTO in the Parent Patent file." A10. As to payment of the statutory fee, while noting that "the USPTO's review of this controversy concluded

---

[7] *See infra* at 37-38 for a discussion of the meaning of "recorded."

that the evidence concerning payment of the filing fee was 'inconclusive'" (A12),

the court held that the PTO nonetheless was permitted to conclude that Harvard

had paid the statutory fee:

> The agency argues, and the Court recognizes and finds
> that the lack of conclusive evidence concerning the
> payment of the fee allows the agency to conclude the fee
> was paid, based on Harvard's representation that it had
> paid the fee, the statements contained on the face of the
> disclaimer, the instructions to debit a particular deposit
> account, the presumption of regularity, and the fact that
> the examiner withdrew its objections to the patent only
> after the disclaimer was filed. This factual determination
> is not arbitrary or capricious or contrary to the law.

*Id.* In other words, the court held that the PTO had discretion to find that the

required fee was enclosed and that the disclaimer was legally entered into the

PTO's official record because the disclaimer appeared in the file wrapper and

stated that the fee was enclosed, even though: (i) the PTO had found that the

evidence on whether Harvard paid the fee was "inconclusive," (ii) the PTO had a

regular practice of placing papers in the file wrapper that were not legally entered

into the record and not accompanied by the required fee, and (iii) Harvard

submitted overwhelming, unrefuted evidence that it did not pay the fee. *See supra*

at 16-20.

The court entirely discounted Appellants' evidence that Harvard did not pay

the required fee, namely the PTO's failure to note payment of the fee on the

terminal disclaimer, the PTO's failure to enter it on the "Contents" page of the file

wrapper, the PTO's failure to give it a paper number or date stamp, and Harvard's declarations showing that it did not pay the statutory fee by check. The court also failed to address the PTO's stated policy at the time that it could not charge disclaimer fees to a deposit account based on a general authorization. The court effectively held that the PTO could violate its own stated policy by charging Harvard's attorney's deposit account, even though the court found no evidence that the PTO actually did so in this case. A11 at n.2, A12.

Additionally, the court held that Appellants' action was barred by laches because "Harvard filed the terminal disclaimer more than twenty years ago and never sought to have it removed from the public file wrapper." A12-13. The court rejected Appellants' argument that they did not appreciate that the terminal disclaimer might be applied to the '803 patent until recently (A13), even though (i) the terminal disclaimer was never filed during prosecution of the '803 patent, (ii) there was no double patenting issue during prosecution of the '803 patent, (iii) Appellants could not have filed an APA action any earlier than the PTO's petition decision, and (iv) Appellants could not have withdrawn the terminal disclaimer from the file wrapper of the '571 patent after it issued.

## V.  SUMMARY OF THE ARGUMENT

The district court erred by affirming the PTO's decision to refuse to enter Harvard's proposed new claims on the ground that the '803 patent had expired in

view of a terminal disclaimer filed during prosecution of the '571 patent. More specifically, the court erred by holding that the PTO's finding that Harvard had paid the disclaimer fee required by statute was not arbitrary and capricious, given the PTO admission that the evidence on payment of the fee was "inconclusive" and Harvard's submission of evidence showing that it did not pay the fee.

To create an effective, valid terminal disclaimer, a patent applicant must pay the fee required by law. Here, overwhelming evidence shows that Harvard failed to pay the required statutory fee, notwithstanding its statement in the terminal disclaimer that a fee was attached. Specifically, the PTO's file wrapper and Harvard's declarations constitute unrefuted evidence that Harvard never paid the fee. Moreover, given the PTO's failure to follow its regular practice of noting payment of the fee on the terminal disclaimer and identifying the terminal disclaimer on the patent, the "presumption of regularity" creates an unrebutted presumption that the disclaimer was not effective and valid due to nonpayment of the fee. Under such circumstances, the PTO could not find that Harvard had paid the fee.

Additionally, the court erred by applying laches to bar this action on the ground that Harvard waited too long to address the terminal disclaimer issue. Harvard had no reason or mechanism to take any action to address the ineffective and invalid disclaimer until the issue arose during the reexamination of the '803

26

patent. Once the issue arose, Appellants took prompt action by petitioning the PTO and then filing this action.

## VI.    ARGUMENT

### A.    Standard of Review

This Court reviews the district court's decision to grant summary judgment *de novo*. *See*, *e.g.*, *Burandt v. Dudas*, 528 F.3d 1329, 1332 (Fed. Cir. 2008) ("We review a district court's grant of summary judgment de novo, reapplying the standard applicable at the district court."). Because this is an APA action, the Court reviews the PTO's petition decision under the "arbitrary and capricious" standard. *Id.* Under this standard, "[a] court reviewing the agency decision 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Id.* (citing *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)). An agency errs if its "decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors." *Star Fruits S.N.C. v. U.S.*, 393 F.3d 1277, 1281 (Fed. Cir. 2005).

This Court reviews the district court's decision to apply laches under the "abuse of discretion" standard. *Pei-Herng Hor v. Ching-Wu Chu*, 699 F.3d 1331, 1334 (Fed. Cir. 2012) ("When reviewing a laches decision rendered on summary

27

judgment, this court reviews for an abuse of discretion unless genuine issues of material fact preclude summary judgment."). "An appellate court, however, may set aside a discretionary decision [to apply laches] if the decision rests on an erroneous interpretation of the law or on clearly erroneous factual underpinnings." *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1039 (Fed. Cir. 1992). A laches determination also may be set aside "if the trial court's decision represents an unreasonable judgment in weighing relevant factors." *Id.* Moreover, "[i]f the decision on laches is made on summary judgment, there must, in addition, be no genuine issues of material fact, the burden of proof of an issue must be correctly allocated, and all pertinent factors must be considered." *Id.*

**B.    The district court erred by holding that the PTO's finding that Harvard paid the statutory fee required for a terminal disclaimer was not arbitrary and capricious.**

**1.    A terminal disclaimer is not effective unless the patent applicant pays the statutory fee.**

Pursuant to 35 U.S.C. § 253 (1975), a patent applicant must pay the required disclaimer fee in order to create an effective, valid terminal disclaimer:

> A patentee, whether of the whole or any sectional interest therein, may, **on payment of the fee required by law**, make disclaimer of any complete claim, stating therein the extent of his interest in such patent. Such disclaimer shall be in writing, and recorded in the Patent and Trademark Office; and it shall thereafter be considered as part of the original patent to the extent of the interest possessed by the disclaimant and by those claiming under him.

> **In like manner** any patentee or applicant may disclaim
> or dedicate to the public the entire term, or **any terminal
> part of the term**, of the patent granted or to be granted."

*Id.* (emphasis added). The PTO's rules confirm that payment of the fee was required for an effective, valid terminal disclaimer. 37 C.F.R. § 1.321(b) (1989) ("A terminal disclaimer, when filed in an application to obviate a double patenting rejection, **must be accompanied by the fee set forth in § 1.20(d)** … ." (emphasis added)). And this Court likewise has held that payment of the required fee by the applicant is one of "the requirements for a valid disclaimer … ." *Vectra Fitness, Inc. v. TNWK Corp.*, 162 F.3d 1379, 1382 (Fed. Cir. 1998); *see also Boyden v. Comm'n of Patents*, 441 F.2d 1041, 1044 (D.C. Cir. 1971) (holding "there is no grant of discretionary power to" the Commissioner of Patents that would allow him to waive patent fees required by statute).

### 2. The PTO abused its discretion by finding that Harvard paid the statutory fee required for a terminal disclaimer.

As explained by the district court, "the USPTO's review of this controversy concluded that the evidence concerning payment of the [terminal disclaimer] filing fee was 'inconclusive.'" A12. More significantly, its review was not only inconclusive but the PTO had no actual evidence showing that the fee was paid. Nonetheless, the PTO argued that it was permitted to find that the fee was paid in view of (i) the "presumption of regularity" and the fact that it had placed a copy of

the terminal disclaimer in the file wrapper,[8] (ii) the statement in the disclaimer that the fee was enclosed, and (iii) the statement in the response providing a general authorization to charge "any fees" to the attorney's deposit account without specifically identifying the terminal disclaimer. *Supra* at 21-23. In making this finding, the PTO abused its discretion under the APA by disregarding the overwhelming, unrefuted evidence showing that the fee was <u>not</u> paid and by relying on the general authorization to charge the deposit account, even though the PTO's stated policy was not to charge a disclaimer fee to a deposit account based on a general authorization.

### a. The overwhelming and unrefuted evidence shows that, contrary to the incorrect statement in the terminal disclaimer, Harvard did not pay the fee required by statute.

As a threshold matter, the PTO's own file wrapper shows that the statutory fee was not paid. The terminal disclaimer does not bear any marking acknowledging payment of the terminal disclaimer fee payment, as it would if the fee had been paid. The PTO had a regular practice of noting receipt of fee payments on the document corresponding to the payment. Unlike the disclaimer, all other papers in the file wrapper that required a fee included a notation on the paper indicating receipt of the payment. *See supra* at 9-10.

---

[8] The PTO Director did not rely on the "presumption of regularity" in his decision denying Harvard's petition.

While this Court has held that the effectiveness of a terminal disclaimer is not dependent upon actions taken by the PTO, *Vectra Fitness*, 162 F.3d at 1382 (rejecting the argument that a "disclaimer had no effect" because the PTO mishandled it), that holding does not apply to the requirement for the filing by the applicant of a disclaimer fee. *Id.* Indeed, this Court has made clear that the validity of a terminal disclaimer *is* dependent on the applicant's compliance with the statutory requirements, including payment of the fee. *Id.*

Moreover, given the PTO's regular practice of noting all payments of fees on the corresponding paper, its failure to do so on the disclaimer at the very least creates a presumption that Harvard did not pay the statutory fee. Specifically, in view of the PTO's regular practice, the "presumption of regularity" creates an unrebutted presumption that the PTO did <u>not</u> receive any fee payment from Harvard because it did not note any payment on the terminal disclaimer. *See*, *e.g.*, *U.S. v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.").

Furthermore, Harvard's attorney testified that, based on a review of his prosecution file, he did not believe that he submitted a check for the terminal disclaimer, notwithstanding the statement in the terminal disclaimer to the

contrary. *Supra* at 17-18. Specifically, he testified that his file did not contain a copy of a check for the terminal disclaimer fee, and that his standard practice included placing a copy of any check submitted to the PTO in the file. *Id.* He further testified that he could not find any other evidence in the file showing that a check had been submitted. *Supra* at 18. Harvard also presented evidence that the Controller of Fish & Richardson (the firm that handled prosecution of the '803 patent) searched for a canceled check for the disclaimer fee at the relevant time period and determined that it did not exist. *Id.* Harvard's evidence stands unrefuted.

Additionally, the PTO's handling of the terminal disclaimer shows that the PTO did not enter it into the official record, as it would have done if the fee had been paid and all other statutory requirements for a disclaimer had been met. For example, the PTO did not list the terminal disclaimer on the "Contents" page of the file wrapper of the '571 patents or give it a paper number, as specified in the MPEP. *See* MPEP § 717.01 (5th ed. Rev. 6, Oct. 1987) ("Papers that do not become a permanent part of the record should not be entered on the 'Contents' of the file wrapper."); MPEP § 719.01 (8th ed. Rev. 9, Aug. 2012) ("All papers legally entered on the 'Contents' of the file wrapper are given a paper number."). The PTO also failed to give the terminal disclaimer a date stamp, as specified in the PTO rules. *See* 37 C.F.R. § 1.6 (1989) ("Letters and other papers received in

the Patent and Trademark Office are stamped with the date of receipt"). And, as explained above, the PTO did not note receipt of payment on the disclaimer. *Supra* at 9-13.

Furthermore, neither the issued '571 patent nor the issued '803 patent bears any indication of a terminal disclaimer, even though it was the PTO's regular practice to identify an effective and valid terminal disclaimer on the patent face. As explained in MPEP § 2701 (8th ed. Rev. 2, May 2004), "[b]efore June 8, 1995, the terminal disclaimer date was printed on the face of the patent." *See also* 37 C.F.R. § 1.321 (1992) ("A notice of disclaimer is published in the *Official Gazette* and attached to the printed copies of the specification."). The '571 patent issued in 1992 without any mention of the disclaimer. *Supra* at 14. Again, the "presumption of regularity" creates an unrebutted presumption that the disclaimer was not legally effective and valid based on Harvard's failure to pay the statutory fee because, if it were, the PTO would have listed it on the face of patent.

### b. The PTO's finding that it might have charged the disclaimer fee to Harvard's attorney's deposit account was arbitrary and capricious.

The district court erred by holding that the PTO had discretion to find that Harvard paid the statutory fee based on its attorney's general authorization in the response to the office action that "any fees" could be charged to his deposit account. *Supra* at 23-25. As of the filing date of the terminal disclaimer, the

MPEP stated that disclaimer fees "will not be charged [to a deposit account] as a result of a general authorization" to charge "all fees" to the deposit account. MPEP § 509.01 (5th ed. Rev. 11, Apr. 1989) ("Fees under 37 CFR 1.19, 1.20[9] and 1.21 will not be charged as a result of a general authorization under 37 CFR 1.25."). *Supra* at 11-12.

Given that Harvard's attorney did not provide specific authorization to charge the terminal disclaimer fee to his deposit account, the PTO's policy, as stated in the MPEP, precluded it from charging the disclaimer fee to the deposit account. By relying on Harvard's attorney's general authorization to charge "any fees" to his deposit account to find that Harvard paid the disclaimer fee, the PTO effectively assumed that it would have violated its own policies and practices. That determination was arbitrary and capricious. *See, e.g., U.S. v. Heffner*, 420 F.2d 809, 811 (4th Cir. 1969) ("An agency of the government must scrupulously observe rules, regulations, or procedures which it has established. When it fails to do so, its action cannot stand and courts will strike it down."); *Simmons v. Block*, 782 F.2d 1545, 1550 (11th Cir. 1986) ("The failure of an agency to comply with its own regulations constitutes arbitrary and capricious conduct.").

Moreover, as explained above, the PTO failed to note payment of the statutory fee on the terminal disclaimer. As with fees paid by check, the PTO has a

---

[9] 37 C.F.R. § 1.20(d) identifies the fee for a statutory disclaimer.

regular practice of noting payment of fees paid by deposit account charge on the paper requiring the fee. *See* A5387 (paper showing example of deposit account fee stamp). The PTO's failure to note a deposit account charge on the terminal disclaimer shows that it followed its stated policy against charging deposit accounts for disclaimer fees based on the type of general authorization provided by Harvard's attorney. Accordingly, the "presumption of regularity" creates an unrebutted presumption that the PTO did not charge the deposit account.

### c. The PTO abused its discretion by finding that Harvard must have paid the fee simply because the examiner withdrew the double-patenting rejection after the filing of the terminal disclaimer.

The district court erred by holding that the PTO had discretion to find that the disclaimer fee was paid based on "the fact that the examiner withdrew [her] objections to the patent only after the disclaimer was filed." *Supra* at 21, 24. While the examiner withdrew all of the outstanding claim rejections, including the double patenting rejection, with a blanket statement that cited "arguments" by Harvard that contained a reference to the terminal disclaimer, she did not identify the terminal disclaimer as the reason for withdrawing the double patenting rejection or indicate that the disclaimer was received or entered into the record. Indeed, given the PTO's handling of the disclaimer (e.g., it never gave it a paper number or date stamp and did not list it on the "Contents" page of the file wrapper), it is unclear if the examiner ever received a copy of it. *Supra* at 9-13.

35

Moreover, the record shows that the examiner who withdrew the double patenting rejection disagreed with the reasoning of it and would have withdrawn it without a terminal disclaimer. *Supra* at 14-16. As explained above, the examiner who withdrew the double-patenting rejection applied a restriction requirement inconsistent with it during prosecution of the '803 patent. *Supra* at 15-16. Specifically, the examiner concluded that the claims involved in the double patenting rejection were patentably distinct from each other, which precluded a double patenting rejection. *Id.* Accordingly, the record indicates that the examiner would have withdrawn the double patenting rejection without a terminal disclaimer because she determined that the inventions were patentably distinct.

Under such circumstances, the PTO lacked discretion to conclude that Harvard must have paid the statutory fee simply because the examiner withdrew the double patenting rejection after Harvard filed the terminal disclaimer. The PTO's finding to the contrary constitutes a clear error in judgment because it improperly disregarded the pertinent facts of the case, namely the overwhelming, unrefuted evidence that Harvard never paid the required fee and the evidence showing that the examiner disagreed with the merits of the rejection such that she would have withdrawn it without a terminal disclaimer. *Burandt*, 528 F.3d at 1332 ("A court reviewing the agency decision 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear

36

error of judgment.'") (citing *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)).

> **d. The PTO's reliance on the "presumption of regularity" is misplaced.**

The district court incorrectly held that the PTO could rely on the "presumption of regularity" to support its finding that Harvard had paid the statutory fee because the PTO "recorded" the terminal disclaimer. A10-12; A1318 ("[I]it is of course USPTO's regular practice to record pleadings only if the filing fee has been paid in accordance with the governing regulation."). Neither the PTO nor the court defined their meaning of "recorded." But given the PTO's handling of the disclaimer, it can only mean that the PTO simply placed a copy of the disclaimer in the file wrapper. The PTO, however, does not have a policy of only placing a paper in the file wrapper after all required fees have been paid. Indeed, its policy is exactly the opposite—it routinely places papers in the file wrapper whether or not a required fee has been paid. For example, "[w]hen an application is not prosecuted within the period set for response and thereafter an amendment is filed **without a petition for extension of time and fee pursuant to 37 CFR 1.136(a)**, such amendment shall be endorsed on the file wrapper of the application, but not formally entered." MPEP § 714.17 (5th ed. Rev. 6, Oct. 1987) (emphasis added); *see also* 37 C.F.R. § 1.97(i) (2013) (noting that an information disclosure statement that does not comply with the regulations, such as an information

disclosure statement that is not accompanied by the required fee, "will be placed in the file but will not be considered by the Office."). Accordingly, the "presumption of regularity" does not support the PTO's argument that Harvard paid the fee simply because a copy of the terminal disclaimer appears in the file wrapper.

Moreover, to the extent that the term "record" means something beyond placing a copy in the file wrapper, the PTO did not "record" the terminal disclaimer in accordance with its procedures specified in the MPEP. *Supra* at 9-13. Specifically, the PTO did not note receipt of the payment on it, assign it a paper number, apply a date stamp to it, or enter it on the "Contents" page of the file wrapper, as specified in the MPEP. *Id.* Accordingly, even if the PTO had a regular practice of only "recording" a terminal disclaimer after receiving the fee payment, the "presumption of regularity" has been rebutted in this case because the PTO did not follow its regular procedures for handling the terminal disclaimer. *Bristol-Meyers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226, 1236 n.8 (Fed. Cir. 2003) (affirming district court's holding that the presumption of regularity was rebutted where the "file history of the '011 patent is out of compliance with the directive of the Manual of Patent Examining Procedures").

### e. The terminal disclaimer was not legally effective and valid and thus does not affect the term of the '803 patent.

For the reasons explained above, the terminal disclaimer filed during prosecution of the '571 patent was not effective and valid because Harvard failed to pay the disclaimer fee required by law. *Vectra Fitness*, 162 F.3d at 1382 (Payment of the required fee by the applicant is **one of "the requirements for a valid disclaimer**" (emphasis added)). And the PTO Director does not have discretion to waive the statutory fee. *Boyden*, 441 F.2d at 1044 (holding "[t]here is no grant of discretionary power to" the Commissioner of Patents that would allow him to waive patent fees required by statute). Accordingly, the terminal disclaimer did not shorten the term of the '803 patent, which does not end until July 20, 2016 (i.e., seventeen years after the issue date).

## C. The district court abused its discretion by applying laches.

### 1. Standard for Laches

As explained in *A.C. Aukerman*, it is well settled that, to invoke the laches defense, a defendant has burden to prove, *inter alia*, that "the plaintiff delayed filing suit for an unreasonable and inexcusable length of time from the time the plaintiff knew or reasonably should have known of its claim against the defendant … ." 960 F.2d at 1032.

## 2. Harvard did not delay taking appropriate action for an unreasonable and inexcusable length of time.

The district court held that laches applied because "Harvard filed the terminal disclaimer more than twenty years ago and never sought to have it removed from the public file wrapper." A13. After filing the terminal disclaimer during prosecution of the '571 patent, however, Harvard had no reason to focus on the nonpayment of the fee or to revisit the matter until the issue arose in the reexamination of the '803 patent. And Appellants took prompt action thereafter.

During prosecution of the '803 patent, the PTO never rejected the claims on double patenting grounds or indicated that it considered the terminal disclaimer from the '571 patent to apply to the '803 patent. *Supra* at 14-16. On the contrary, the examiner made it clear that she disagreed that there was any double patenting issue. *Supra* at 15-16. Specifically, during prosecution of the '803 patent, she applied a restriction requirement between essentially the same claims rejected on double patenting grounds during prosecution of the '571 patent and the claims of the '866 patent (i.e., the basis of the double patenting rejection) because these different claim sets were directed to patentably distinct inventions. *Id.* Accordingly, Harvard had no reason to address the terminal disclaimer during prosecution of the '803 patent.

Moreover, Harvard could not have withdrawn the terminal disclaimer from the public file wrapper of the '803 patent because it never filed or made reference

to the terminal disclaimer in the file wrapper of the '803 patent in the first place. And it could not have withdrawn the terminal disclaimer from the file wrapper of the '571 patent after it issued, which was only several months after the filing date of the '803 patent and before any prosecution had commenced. *In re Yamazaki*, 702 F.3d 1327, 1328 (Fed. Cir. 2012) ("Because we agree that reissue proceedings cannot be used to withdraw a terminal disclaimer from Yamazaki's issued patent, we affirm.").  Under such circumstances, and given that the terminal disclaimer is ineffective as a matter of law, laches should not bar Appellants from correcting the PTO's erroneous decision through this timely-filed APA action.

## VII.  CONCLUSION

For the reasons explained above, the Court should reverse the judgment and direct the district court to enter judgment for Appellants, directing the PTO to allow Harvard to add new claims to the '803 patent because it has not expired.

January 6, 2014                                    Respectfully submitted,


/s/ Christopher B. Mead                            /s/ Donald R. Dunner
Christopher B. Mead                                Donald R. Dunner
London & Mead                                      Ronald A. Bleeker
1225 19th Street, NW                               Andrew J. Vance
Suite 320                                          FINNEGAN, HENDERSON,
Washington, DC  20009                              FARABOW,
(202) 331-3334                                         GARRETT & DUNNER, L.L.P.
                                                   901 New York Avenue, NW
*Attorney for Plaintiff-Appellant*                 Washington, DC  20001
*President and Fellows of Harvard*                 (202) 408-4000
*College*
                                                   *Attorneys for Plaintiff-Appellant*
                                                   *E. I. du Pont de Nemours and Company*

42

CASE PARTICIPANTS ONLY

# ADDENDUM

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division



PRESIDENT AND FELLOWS )
OF HARVARD COLLEGE, )
)
E.I. DU PONT DE NEMOURS AND CO., )
)
    Plaintiff, )
v. )    Civil Action: 1:12cv1034
)
TERESA STANEK REA, Acting Under )
Secretary of Commerce for Intellectual )
Property and Acting Director of the United )
States Patent and Trademark Office )
)
    Defendant. )
)

## JUDGMENT

Pursuant to the Order of this Court entered on May 15, 2013, and in accordance with

Federal Rules of Civil Procedure 56, JUDGMENT is hereby entered in favor of Defendant,

Teresa Stanek Rea, and against Plaintiff, President and Fellows of Harvard College and E.I. Du

Pont De Nemours and Co.

FERNANDO GALINDO, CLERK

By: _____/s/_____
        Deputy Clerk

Alexandria, Virginia
May 16, 2013

**A1**

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**



PRESIDENT AND FELLOWS )
OF HARVARD COLLEGE, )
)
E.I. DU PONT DE NEMOURS AND CO., )
)
Plaintiff, )
)
v. )     Civil Action No.: 1:12-cv-1034
)
TERESA STANEK REA, Acting Under )
Secretary of Commerce for Intellectual )
Property and Acting Director of the United )
States Patent and Trademark Office )
)
Defendant. )

## ORDER

This matter comes before the Court on the parties' cross-motions for summary judgment

(Dkts. No. 21, 23). Plaintiffs President and Fellows of Harvard College ("Harvard") and E.I. Du

Pont De Nemours and Co. ("Du Pont") (collectively "Plaintiffs") brought this action under the

Administrative Procedure Act ("APA"), claiming that Defendant United States Patent and

Trademark Office ("USPTO") improperly determined that their patent, U.S. Patent No.

5,925,803 ("Subject Patent") had expired and, therefore, improperly refused to enter certain

claims during the reexamination of the patent. Defendant opposes Plaintiffs' motion for

summary judgment and filed a cross-motion for summary judgment, which Defendant opposes.

A hearing was held before this Court on April 19, 2013.

Having reviewed the USPTO's legal conclusions *de novo* and having found the agency's

factual findings were not arbitrary or capricious, Defendant USPTO is entitled to summary

1

**A2**

judgment.  For the reasons stated in the accompanying Memorandum Opinion and for good

cause shown, it is hereby

ORDERED that Defendant Teresa Stanek Rea's motion for summary judgment is

GRANTED and Plaintiffs' motion for summary judgment is DENIED.

The Clerk shall enter judgment pursuant to Fed. R. Civ. P. 56.

May 15 , 2013
Alexandria, Virginia

/s/

Liam O'Grady
United States District Judge

**A3**



F I L E D

MAY 15 2013

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

**UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

PRESIDENT AND FELLOWS )
OF HARVARD COLLEGE, )
 )
E.I. DU PONT DE NEMOURS AND CO., )
 )
      Plaintiff, )
 )
v. )      Civil Action No.: 1:12-cv-1034
 )
TERESA STANEK REA, Acting Under )
Secretary of Commerce for Intellectual )
Property and Acting Director of the United )
States Patent and Trademark Office )
 )
      Defendant. )

## MEMORANDUM OPINION

This matter comes before the Court on the parties' cross-motions for summary judgment

(Dkts. No. 21, 23). Plaintiffs President and Fellows of Harvard College ("Harvard") and E.I. Du

Pont De Nemours and Co. ("Du Pont") (collectively "Plaintiffs") brought this action under the

Administrative Procedure Act ("APA"), claiming that Defendant United States Patent and

Trademark Office ("USPTO") improperly determined that their patent, U.S. Patent No.

5,925,803 ("Subject Patent") had expired and, therefore, improperly refused to enter certain

claims during the reexamination of the patent. Defendant opposes Plaintiffs' motion for

summary judgment and filed a cross-motion for summary judgment, which Defendant opposes.

A hearing was held before this Court on April 19, 2013.

## I.    BACKGROUND

On April 12, 1988, Harvard was granted a patent entitled "Transgenic non-human

mammals," U.S. Patent No. 4,736,866 ("Grandparent Patent"), which expired after 17 years on

April 12, 2005. On March 22, 1988, Harvard filed a divisional patent application, U.S. Patent

No. 5,087,571 ("Parent Patent") to the Grandparent Patent, but in November 1988 the USPTO

issued an office action rejecting certain claims in the application for obviousness-type double

patenting. The USPTO cited the Grandparent Patent, finding that the Parent Patent claims were

already found in the Grandparent Patent.

The Parent Patent application was then assigned to a different examiner. Attempting to

cure the original examiner's rejection, Harvard submitted additional materials, including a

terminal disclaimer, claim amendments, additional arguments, and a declaration by one of the

inventors. (Ex. 19 at A254-A267 and A303-304). The most critical consideration before the

Court concerns the terminal disclaimer that Harvard filed in response to the rejection.

**A.     Terminal Disclaimer**

The terminal disclaimer Harvard submitted on November 10, 1989, stated that Harvard,

"the owner of the entire interest in the [Parent Patent] application"

> hereby disclaims any portion of any patent granted on the [Parent Patent] application or
> on any application which is entitled to the benefit of the filing date of the [Parent Patent]
> application under 35 U.S.C. § 120 not extending the term of any patent granted on that
> application beyond the term of [the Grandparent Patent] issued April 12, 1988.

Admin. Record at A114. In addition, the terminal disclaimer states that the applicant intended

that it "run with any patent so granted" and is binding on any of its successors or assignees, such

as Du Pont. *Id.* Finally, the disclaimer states, "Accompanying this disclaimer is the fee set forth

in 37 C.F.R. § 1.20(d)."[1] Admin. Record at A115. Notably, at the time of the filing, the USPTO

provided a terminal disclaimer template for applicants to fill out with their information.

---

[1] Harvard's submission that included the terminal disclaimer also included general instructions
authorizing USPTO to charge Harvard's account to pay any filing fees. "Please charge any fees
to Deposit Account No. 06-XXXX." Admin. Record at A262.

Nonetheless, Harvard chose to draft its own terminal disclaimer rather than use the standard form. The only difference in substance was that the standard form did not mention any downstream applications that might claim the same priority filing date, whereas Harvard's disclaimer expressly states that it applies to "any application which is entitled to the benefit of the filing date" of the subject application. Admin. Record at A114.

Ultimately, the terminal disclaimer was signed, sealed, and dated by Harvard's official agent and director and filed with the USPTO. Upon receipt of the pleadings and statements, the USPTO recorded the terminal disclaimer in the official prosecution history of the Parent Patent, where it remains today. At no time has Harvard or its assignees attempted to withdraw the disclaimer. Following Harvard's supplemental filings, the new examiner withdrew the then-pending rejections "in view of Applicants' arguments, amendments to the claims and the Rule 132 Declaration." Dkt. No. 20, Ex. 1 at A2.

### B. Administrative Proceedings

In April 2010, a third party requested a reexamination of Harvard's Subject Patent, U.S. Patent No. 5,925,803, claiming that the Subject Patent had expired in 2005 due to the terminal disclaimer. On June 7, 2010, the USPTO granted the request for *ex parte* reexamination of the Subject Patent. The USPTO took the position that several references cited by the third party raised substantial questions of patentability. Ultimately, the USPTO examiner issued a non-final Office Action in October 2010, rejecting claims 1-3 in the Subject Patent and alleging that the patent had expired on April 12, 2005 due to the terminal disclaimer. The patent was found unpatentable due to obviousness-type double patenting. Harvard responded to the Office Action on December 21, 2010, adding dependent claims 4-10, arguing that claims 1-3 should not have been rejected and that the Subject Patent had not expired.

On April 2, 2011, the USPTO examiner issued a Notice of Intent to Issue Reexamination Certificate, in which she withdrew all of the previously entered claim rejections. The examiner refused, however, to enter Harvard's proposed amendment to add claims 4-10. She explained that the amendment did not comply with 37 C.F.R. § 1.530(j), which provides that "no amendment, other than the cancellation of claims, will be incorporated into [a reexamined patent] by certificate issued after the expiration of the patent." Having found that the Subject Patent had expired due to the terminal disclaimer, the examiner rejected Harvard's claims 4-10.

On May 5, 2011, Harvard petitioned the USPTO to review its decision, claiming there was no legal basis for the examiner's claim that the Parent Patent had expired. Harvard argued that the terminal disclaimer had no legal effect upon the term of the Parent Patent. Specifically, they claimed that (1) the patent made no mention of the terminal disclaimer, (b) no terminal disclaimer was even mentioned during the patent's prosecution, and (c) the terminal disclaimer was not entered in the Parent Patent application. Admin. Record at A232-A233. Harvard also submitted supplemental material to its petition, claiming that the terminal disclaimer was never effective because Harvard had not paid the statutorily required filing fee, pursuant to 35 U.S.C. § 253.

On July 11, 2011, the USPTO Director issued a decision affirming the examiner's decision that the patent had expired. Harvard then filed a request for reconsideration of its petition and requesting that the agency withdraw or vacate the Reexamination Certificate, reopen reexamination, and direct claims 4-10 be entered. *See* Admin. Record at A315-A331. On June 12, 2012, the USPTO issued its final decision, holding that the 1989 terminal disclaimer was valid and that the Subject Patent had expired.

As part of its final decision, the USPTO rejected Harvard's argument that the agency had not relied on the disclaimer in prosecuting the Parent Patent, finding that the evidence from the record was "inconclusive." The agency also determined that Harvard had never attempted to withdraw the disclaimer, so it remains part of the official, public administrative record of the Parent Patent. Finally, the USPTO rejected Harvard's claim that the terminal disclaimer could not be effective because the filing fee was never paid.

Harvard appealed the USPTO's final decision by instituting this civil action under the Administrative Procedures Act on September 14, 2012.

## II.  STANDARD OF REVIEW

### A.  Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). Entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The non-moving party must go beyond the pleadings and mere allegations to "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 323. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis original). Indeed, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

### B.  Administrative Procedures Act Review

The Administrative Procedure Act ("APA") provides an additional standard for cases involving a final agency action, such as the decision before the Court from the USPTO. *Dickinson v. Zurko*, 527 U.S. 150, 164 (1999). Under the APA, an agency action may be set aside if the court finds that the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Ultimately, the Court should grant summary judgment if the moving party has shown "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

When a party seeks review of agency action under the APA before a district court, the district judge sits as an appellate tribunal. The entire case on review is a question of law, and the complaint, properly read, actually presents no factual allegations, but rather only arguments about the legal conclusion to be drawn about the agency action. The district court's review must be based on the administrative record and is limited to determining whether the agency acted arbitrarily or capriciously. *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009). The burden of showing the agency action was arbitrary and capricious lies with the plaintiff. *See Ohio Valley Environmental Coalition v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009).

## III.  ANALYSIS

Plaintiffs contend that the USPTO acted arbitrarily and capriciously when it refused to grant claims 4-10 of the Subject Patent. Plaintiffs' arguments rest entirely within the administrative record, which they claim demonstrates that the terminal disclaimer was never relied upon by the USPTO during the prosecution of the prior patents, and should not have been relied upon because it was not an effective terminal disclaimer as defined by 35 U.S.C. § 253. The USPTO challenges Plaintiffs' contentions by claiming that the terminal disclaimer was effectively recorded, thus becoming part of the official record for the Parent Patent.

6

Furthermore, the USPTO claims that the disclaimer was relied upon during the reexamination of the Subject Patent.

## A.    The Recorded Terminal Disclaimer

Plaintiffs' primary argument rests on their representation that the filing fee that must accompany any terminal disclaimer was never paid.  Under 35 U.S.C. § 253,

> (a) A patentee...may, on payment of the fee required by law, make disclaimer of any complete claim, stating therein the extent of his interest in such patent. Such a disclaimer shall be in writing, and recorded in the Patent and Trademark Office; and it shall thereafter be considered as part of the original patent to the extent of the interest possessed by the disclaimant and by those claiming under him.

> (b) In the manner set forth in subsection(a), any patentee or applicant may disclaim or dedicate to the public the entire term, or any terminal part of the term, of the patent granted or to be granted.

It is undisputed that Harvard intentionally filed the terminal disclaimer in writing and that it was effectively recorded by the USPTO in the Parent Patent file.  Harvard argues nonetheless that the USPTO's inability to locate a document in the file proving that the filing fee was recorded is a fatal flaw, and that failure to pay the statutory filing fee left the § 253 statutory requirements unsatisfied.  The disclaimer, therefore, is a nullity and the USPTO's reliance on it is arbitrary and capricious.

In furtherance of their position, Plaintiffs direct the Court's attention to the fact that every document in the Parent Patent's file contained the USPTO stamp, which indicates when payments were made and when documents were recorded, except the terminal disclaimer, which bore no such markings. Harvard also claims that searching back through 25 years of transactions, it was unable to determine if its account had been debited the proper amount, or at all, for the

**A10**

terminal disclaimer filing fee.[2] Similarly, the USPTO is unable to account for any cancelled checks or other definitive evidence that the filing fee was paid.[3] Finally, Plaintiffs argue that the fact that the USPTO's table of contents for the file history of the Parent Patent lists all documents except for the terminal disclaimer is evidence that the disclaimer was not effectively recorded under § 253.

In response to Plaintiffs' arguments that the terminal disclaimer was never relied upon by the examiners, the USPTO relies on *Vectra Fitness, Inc. v. TNWK Corp.*, 162 F.3d 1379 (Fed. Cir. 1998). In that case, the plaintiff filed a terminal disclaimer, and it was received and added to the file wrapper of the relevant patent; however, it was not entered on either the cover page or the contents page of the file wrapper. The USPTO also failed to publish the disclaimer, as required by regulation 37 C.F.R. § 1.321(a). *Id.* at 1381. Nonetheless, the court held that the validity of the disclaimer "is not dependent upon actions taken by the PTO," and that nothing in the statutes or regulations requires any action by the USPTO in order for a disclaimer to be effectively recorded. *Vectra Fitness* also finds the USPTO's similar error in not documenting the disclaimer in the table of contents of the file wrapper is not relevant to the disclaimer's effectiveness.

The USPTO also addresses Plaintiffs' claims that they did not pay the filing fee, citing the doctrine of the presumption of regularity. *See Almy v. Sebelius*, 679 F.3d 297, 309 (4th Cir. 2012). Under the presumption of regularity doctrine, the official acts of an agency are supported in the absence of clear evidence to the contrary and courts presume that the public officers have

---

[2] Harvard admits that is has no evidence that the fee was not paid by some method other than a check. Plaintiffs acknowledge that the relevant evidence related to deposit account disbursements is no longer available and it "could not determine from PTO whether any charges related to the terminal fee...were made" by deposit account. Admin. Record at A245-46.
[3] USPTO does not maintain financial records earlier than 1997. *See* Admin. Record at A245-46.

8

**A11**

properly discharged their official duties. *Id.* (citing *United States v. Chem. Found.*, 272 U.S. 1, 14-15 (1926)). The USPTO argues that it is the regular practice of the agency to record terminal disclaimers only once the filing fee has been paid, as required under § 253, and that absent clear evidence that the agency broke from its regular practice, the court must assume the USPTO acted in accordance with the regulations and recorded the disclaimer only once the fee was paid.

Ultimately, the USPTO's review of this controversy concluded that the evidence concerning payment of the filing fee was "inconclusive." Nonetheless, the USPTO determined that based on the evidence and standard practices, the filing fee was paid and the disclaimer was effective under § 253. The agency argues, and the Court recognizes and finds that the lack of conclusive evidence concerning the payment of the fee allows the agency to conclude the fee was paid, based on Harvard's representation that it had paid the fee, the statements contained on the face of the disclaimer, the instructions to debit a particular deposit account, the presumption of regularity, and the fact that the examiner withdrew its objections to the patent only after the disclaimer was filed. This factual determination is not arbitrary or capricious or contrary to the law.

**B.    Equity**

In the alternative, if the USPTO's factual determination that the filing fee had been paid in satisfaction of § 253 is not entitled to deference, principles of equity require a finding in favor of the agency. Under the doctrine of laches, a defendant may not be liable where there was an unreasonable or inexcusable delay in plaintiff's bringing the case before the court and that delay prejudiced the defendant. *White v. Daniel*, 909 F.2d 99 (4th Cir. 1990). Equitable principles require that the plaintiff bring the action within a reasonable time after plaintiff discovers facts

9

**A12**

giving rise to the cause of action. *Id.* The delay may also be measured, however, from either the time those facts were learned or could have been discovered with reasonable diligence. *Id.*

In this case, Harvard filed the terminal disclaimer more than twenty years ago and never sought to have it removed from the public file wrapper. Plaintiffs argue before this Court that they had not discovered the disclaimer until the USPTO rejected their latest claims. Cutting against Plaintiff's representations, however, is the fact that the terminal disclaimer was part of the publicly accessible record for the Parent Patent. The terminal disclaimer is recorded so that it may be publicly available for anyone studying the patent. Defendant's argument that it had no notice of the disclaimer's effects or that it could not have reasonably discovered the terminal disclaimer until recently is without merit, especially since they filed it. In the interests of equity, Plaintiffs cannot now disavow the terminal disclaimer due to its own alleged clerical mistake after having waited more than two decades.

## IV. CONCLUSION

Having reviewed the USPTO's legal conclusions *de novo* and having found the agency's factual findings were not arbitrary or capricious, Defendant USPTO is entitled to summary judgment.

For the reasons stated herein and for good cause shown, it is hereby

ORDERED that Defendant Teresa Stanek Rea's motion for summary judgment is GRANTED and Plaintiffs' motion for summary judgment is DENIED.

The Clerk shall enter judgment pursuant to Fed. R. Civ. P. 56.

May 15, 2013
Alexandria, Virginia

/s/
Liam O'Grady
United States District Judge

**A13**

# UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

PRESIDENT AND FELLOWS                  )
OF HARVARD COLLEGE,                     )
                                        )
E.I. DU PONT DE NEMOURS AND CO.,        )
                                        )
          Plaintiff,                    )
                                        )
v.                                      )          Civil Action No.: 1:12-cv-1034
                                        )
TERESA STANEK REA, Acting Under         )
Secretary of Commerce for Intellectual  )
Property and Acting Director of the United )
States Patent and Trademark Office      )
                                        )
          Defendant.                    )

## ORDER

This matter comes before the Court on Plaintiffs' President and Fellow of Harvard

College's and E.I. Du Pont De Nemours and Co.'s Motion to Alter Judgment or Amend the

Judgment (Dkt. No. 35). The motion is opposed by Defendant United States Patent and

Trademark Office ("USPTO") and the Court held a hearing on April 19, 2013.

After a full briefing and oral argument, the Court granted Defendant USPTO's Motion

for Summary Judgment for the reasons stated Memorandum Opinion (Dkt. No. 32)

accompanying the Order (Dkt. No. 33) dated May 15, 2013 and for good cause shown.

On June 11, 2013, Plaintiffs sought to alter or amend the judgment, pursuant to Fed. R.

Civ. P. 59(e), arguing that the Court made a clear error of law amounting to a manifest injustice.

After a full review of the record as well as the pleadings from each party on this Motion, the

Court finds that there was no clear error in the Order or Memorandum Opinion dated May 15,

A14

2013. Furthermore, Plaintiffs have failed to satisfy any of the limited circumstances under which

a Fed. R. Civ. P. 59(3) motion may be granted.

For good cause shown, it is hereby

ORDERED that Plaintiffs' Motion to Alter Judgment or Amend Judgment (Dkt. No. 35)

is DENIED.

July 2, 2013
Alexandria, Virginia

/s/

Liam O'Grady
United States District Judge

**A15**

US005925803A

# United States Patent [19]

## Leder et al.

[11] **Patent Number:** 5,925,803

[45] **Date of Patent:** Jul. 20, 1999

[54] **TESTING METHOD USING TRANSGENIC MICE EXPRESSING AN ONCOGENE**

[75] Inventors: **Philip Leder**, Chestnut Hill, Mass.; **Timothy A. Stewart**, San Francisco, Calif.

[73] Assignee: **President and Fellows of Havard College**, Cambridge, Mass.

[21] Appl. No.: **07/750,518**

[22] Filed: **Sep. 19, 1991**

### Related U.S. Application Data

[60] Continuation of application No. 07/171,806, Mar. 22, 1988, Pat. No. 5,087,571, which is a division of application No. 06/623,774, Jun. 22, 1984, Pat. No. 4,736,866.

[51] **Int. Cl.**[6] .......................... **G01N 33/00**; A01K 67/00; A01K 69/00; A01K 67/027

[52] **U.S. Cl.** .................................. **800/3**; 800/10; 800/18; 424/9.2

[58] **Field of Search** ................................. 800/2, DIG. 1, 800/3, 10, 18; 424/2, 9, 9.2; 435/172.3, 240.2, 317.1; 935/32, 70

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,535,058 | 8/1985 | Weinberg et al. | 435/6 |
| 4,579,821 | 4/1986 | Palmiter et al. | 435/172.3 |
| 4,873,191 | 10/1989 | Wagner et al. | 435/172.3 |

#### OTHER PUBLICATIONS

Blair et al., Activation of the Transforming Potential of a Normal Cell Sequence: A Molecular Model for Oncogenesis, Science 212:941–943, 1981.

Brinster et al., Expression of a Microinjected Immunoglobulin Gene in the Spleen of Transgenic Mice, Nature 306:332–336, 1983.

Constantini and Lacy, Introduction of a Rabbit β–globin Gene into the Mouse Germ Line, Nature 294:92, 1981.

Der et al., Transforming Genes of Human Bladder and Lung Carcinoma Cell Lines are Homologous to the ras Genes and Harvey and Kirsten Sarcoma Viruses, Proc. Natl. Acad. Sci. USA 79:3637–3640, 1982.

Ellis et al., The p21 src Genes of Harvey and Kirsten Sarcoma Viruses Originate from Divergent Members of a Family of Normal Vertebrate Genes, Nature 292:506–511, 1981.

Goldfarb et al., Isolation and Preliminary Characterization of a Human Transforming Gene from T24 Bladder Carcinoma Cells, Nature 296:404–409, 1981.

Gorman et al., The Rous Sarcoma Virus Long Terminal Repeat is a Strong Promoter when Introduced into a Variety of Eurkaryotic Cells by DNA–mediated Transfection, Proc. Natl. Acad. Sci. USA 79:6777–6781, 1982.

Huang et al., Glucocorticoid Regulation of the Ha–MuSV p21 Gene Conferred by Sequences from Mouse Mammary Tumor Virus, Cell 27:245–255, 1981.

Lacy et al., A Foreign β–Globin Gene in Transgenic Mice: Integration at Abnormal Chromosomal Positions and Expression in Inappropriate Tissues, Cell 34:343–358, 1983.

McKnight et al., Expression of the Chicken Transferrin Gene in Transgenic Mice, Cell 34:335–341, 1983.

Palmiter, Differential Regulation of Metallothionein–Thymidine Kinase Fusion Genes in Transgenic Mice and Their Offspring, Cell 29:701–710, 1982.

Palmiter et al., Dramatic Growth of Mice that Develop from Eggs Microinjected with Metallothionein–growth Hormone Fusion Genes, Nature 300:611–615, 1982.

Palmiter et al., Metallothionein–Human GH Fusion Genes Stimulate Growth of Mice, Science 222:809–814, 1983.

Schwab et al., Hypersenstivity for Carcinogenesis Resulting from Species . . . Animals Suitable for Monitoring Carcinogens, EPA–600/9–82–013 Sym: Carcinogen. Polynucl. Anomet. Hydrocarbone Mar. Environ, 212–32 (1982).

Shih and Weinberg, Isolation of a Transforming Sequence from a Human Bladder Carcinoma Cell Line, Cell 29:161–169, 1982.

Stewart et al., Human β–Globin Gene Sequences Injected into Mouse Eggs, Retained in Adults, and Transmitted to Progeny, Science 217:1046–1048, 1982.

Ucker et al., Mammary Tumor Virus DNA Contains Sequences Required for its Hormone–Regulated Transcription, Cell 27:257–266, 1981.

Van Brunt, Molecular Farming: Transgenic Animals as Bioreactors, Biotechnology 6:1149–1154, 1988.

Wagner et al., The Human β–Globin and a Functional Viral Thymidine Kinase Gene in Developing Mice, Proc. Natl. Acad. Sci. USA 78:5016–5020, 1981.

Wilmut et al., A Revolution in Animal Breeding, New Scientist, Jul. 7, 1988, pp. 56–59.

Ward et al., Toxicol. Appl. Pharmacol. 51:389–397 (1979).

Schach et al., Fundamental & Appl. Toxicol. 3:631–639 (1983).

*Primary Examiner*—Deborah Crouch

*Attorney, Agent, or Firm*—Clark & Elbing, LLP

[57] **ABSTRACT**

A transgenic non-human eukaryotic animal whose germ cells and somatic cells contain an activated oncogene sequence introduced into the animal, or an ancestor of the animal, at an embryonic stage.

**3 Claims, 2 Drawing Sheets**



## Fig. 1



## Fig. 2



## Fig. 3

## Fig. 4



**Fig. 5**



**Fig. 6**



**Fig. 7**



**Fig. 8**

5,925,803

1

## TESTING METHOD USING TRANSGENIC MICE EXPRESSING AN ONCOGENE

This is a continuation application of U.S. application Ser. No. 07/171,806, filed Mar. 22, 1988, issued as U.S. Pat. No. 5,087,571, which is in turn a divisional application of U.S. application Ser. No. 06/623,774, filed Jun. 22, 1984, issued as U.S. Pat. No. 4,736,866.

### BACKGROUND OF THE INVENTION

This invention relates to transgenic animals.

Transgenic animals carry a gene which has been introduced into the germline of the animal, or an ancestor of the animal, at an early (usually one-cell) developmental stage. Wagner et al. (1981) P.N.A.S. U.S.A. 78, 5016; and Stewart et al. (1982) Science 217, 1046 describe transgenic mice containing human globin genes. Constantini et al. (1981) Nature 294, 92; and Lacy et al. (1983) Cell 34, 343 describe transgenic mice containing rabbit globin genes. McKnight et al. (1983) Cell 34, 335 describes transgenic mice containing the chicken transferrin gene. Brinster et al. (1983) Nature 306, 332 describes transgenic mice containing a functionally rearranged immunoglobulin gene. Palmiter et al. (1982) Nature 300, 611 describes transgenic mice containing the rat growth hormone gene fused to a heavy metal-inducible metalothionein promoter sequence. Palmiter et al. (1982) Cell 29, 701 describes transgenic mice containing a thymidine kinase gene fused to a metalothionein promoter sequence. Palmiter et al. (1983) Science 222, 809 describes transgenic mice containing the human growth hormone gene fused to a metalothionein promoter sequence.

### SUMMARY OF THE INVENTION

In general, the invention features a transgenic non-human eukaryotic animal (preferably a rodent such as a mouse) whose germ cells and somatic cells contain an activated oncogene sequence introduced into the animal, or an ancestor of the animal, at an embryonic stage (preferably the one-cell, or fertilized oocyte, stage, and generally not later than about the 8-cell stage). An activated oncogene sequence, as the term is used herein, means an oncogene which, when incorporated into the genome of the animal, increases the probability of the development of neoplasms (particularly malignant tumors) in the animal. There are several means by which an oncogene can be introduced into an animal embryo so as to be chromosomally incorporated in an activated state. One method is to transfect the embryo with the gene as it occurs naturally, and select transgenic animals in which the gene has integrated into the chromosome at a locus which results in activation. Other activation methods involve modifying the oncogene or its control sequences prior to introduction into the embryo. One such method is to transfect the embryo using a vector containing an already translocated oncogene. Other methods are to use an oncogene whose transcription is under the control of a synthetic or viral activating promoter, or to use an oncogene activated by one or more base pair substitutions, deletions, or additions.

In a preferred embodiment, the chromosome of the transgenic animal includes an endogenous coding sequence (most preferably the c-myc gene, hereinafter the myc gene), which is substantially the same as the oncogene sequence, and transcription of the oncogene sequence is under the control of a promoter sequence different from the promoter sequence controlling transcription of the endogenous coding sequence. The oncogene sequence can also be under the

2

control of a synthetic promoter sequence. Preferably, the promoter sequence controlling transcription of the oncogene sequence is inducible.

Introduction of the oncogene sequence at the fertilized oocyte stage ensures that the oncogene sequence will be present in all of the germ cells and somatic cells of the transgenic animal. The presence of the onocogene sequence in the germ cells of the transgenic "founder" animal in turn means that all of the founder animal's descendants will carry the activated oncogene sequence in all of their germ cells and somatic cells. Introduction of the oncogene sequence at a later embryonic stage might result in the oncogene's absence from some somatic cells of the founder animal, but the descendants of such an animal that inherit the gene will carry the activated oncogene in all of their germ cells and somatic cells.

Any oncogene or effective sequence thereof can be used to produce the transgenic mice of the invention. Table 1, below, lists some known viral and cellular oncogenes, many of which are homologous to DNA sequences endogenous to mice and/or humans, as indicated. The term "oncogene" encompasses both the viral sequences and the homologous endogenous sequences.

### TABLE 1

| Abbreviation | Virus |
|---|---|
| src | Rous Sarcoma Virus (Chicken) |
| yes | Y73 Sarcoma Virus (Chicken) |
| fps | Fijirand (St Feline) Sarcoma Virus (Chicken, Cat) |
| abl | Abelson Murine Leukemia Virus (Mouse) |
| rcs | Rocharere Sarcoma Virus (Chicken) |
| frp | Garmen-Rasheed Feline Sarcoma Virus (Cat) |
| ertB | Avian Eryphatlastosis Virus (Chicken) |
| fms | McDonough Feline Sarcoma Virus (Cat) |
| mcs | Moloney Murine Sarcoma Virus (Mouse) |
| raf | 3611 Murine Sarcoma[+] Virus (Mouse) |
| Ha-ras-1 | Harvey Murine Sarcoma Virus (Rat) (Balb/c mouse; 2 loci) |
| Ki-ras 2 | Kirsten Murine Sarcoma Virus (Pat) |
| Kr-ras 1 | Kirsten Murine Sarcoma Virus (Pat) |
| myc | Avian MC29 Myelocyromatosis Virus (Chicken) |
| myt | Avian Myelo Elastomas (Chicken) |
| fos | FBS Ostecsarcoma Virus (Mouse) |
| sft | Avian SET/TLD Virus (Chicken) |
| rel | Reticuloendotheliosis Virus (Turkey) |
| sis | Simian Sarcoma Virus (Wocel7 Monkey) |
| N-myc | Neuroblastomas (Human) |
| N-ras | Neuroblastoma, Leukemia Sarcoma Virus (Human) |

A33

5,925,803

| | 3 | | 4 |

TABLE 1-continued

| Abbreviation | Virus |
|---|---|
| Blym | Barsal Lymphomas (Chicken) |
| man | Marrary Carcinoma (Human) |
| neu | Neura, Glioblastoma (Rat) |
| ertA1 | Chicken A37 (Chicken) |
| rs-ras | Rasheed Sarcoma Virus (Rat) |
| mnt-myc | Carcinoma Virus NHE (Chicken) |
| myc | Myelocoytomatosis OKCl (Chicken) |
| myt-ets | Avian myeloblastosis emphroblastosis Virus EB6 (Chicken) |
| raf-1 | 3611-MET(Mouse) |
| raf-1 | 3611-Met (Mouse) |
| Ha-mas-1 | H4-MEV (Fat) |
| ertB | Emphroblastosis virus (Chicken) |

The animals of the invention can be used to test a material suspected of being a carcinogen, by exposing the animal to the material and determining neoplastic growth as an indicator of carcinogenicity. This test can be extremely sensitive because of the propensity of the transgenic animals to develop tumors. This sensitivity will permit suspect materials to be tested in much smaller amounts than the amounts used in current animal carcinogenicity studies, and thus will minimize one source of criticism of current methods, that their validity is questionable because the amounts of the tested material used is greatly in excess of amounts to which humans are likely to be exposed. Furthermore, the animals will be expected to develop tumors much sooner because they already contain an activated oncogene. The animals are also preferable, as a test system, to bacteria (used, e.g., in the Ames test) because they, like humans, are vertebrates, and because carcinogenicity, rather than mutagenicity, is measured.

The animals of the invention can also be used as tester animals for materials, e.g. antioxidants such as beta-carotine or Vitamin E, thought to confer protection against the development of neoplasms. An animal is treated with the material, and a reduced incidence of neoplasm development, compared to untreated animals, is detected as an indication of protection. The method can further include exposing treated and untreated animals to a carcinogen prior to, after, or simultaneously with treatment with the protective material.

The animals of the invention can also be used as a source of cells for cell culture. Cells from the animals may advantageously exhibit desirable properties of both normal and transformed cultured cells: i.e., they will be normal or nearly normal morphologically and physiologically, but can, like cells such as NIH 3T3 cells, be cultured for long, and perhaps indefinite, periods of time. Further, where the promoter sequence controlling transcription of the oncogene sequence is inducible, cell growth rate and other culture characteristics can be controlled by adding or eliminating the inducing factor.

Other features and advantages of the invention will be apparent from the description of the preferred embodiments, and from the claims.

DESCRIPTION OF THE PREFERRED EMBODIMENTS

The drawings will first briefly be described.

Drawings

FIG. 1 is a diagrammatic representation of a region of a plasmid bearing the mouse myc gene and flanking regions.

FIG. 2 is a diagrammatic representation of a region of a plasmid, pA9, bearing the mouse mammary tumor virus long terminal repeat (MMTV LTR) sequences.

FIGS. 3–6 and 8 are diagrammatic representations of activated oncogene fusions.

FIG. 7 is a diagrammatic representation of a probe useful for detecting activated myc fusions.

MMTV-myc Fused Genes

Gene fusions were made using the mouse myc gene and the MMTV LTR. The myc gene is known to be an activatable oncogene. (For example, Leder et al. (1983) Science 222, 765 explains how chromosomal translocations that characterize Burkitt's Lymphoma and mouse plasmacytonas result in a juxtaposition of the myc gene and one of the immunoglobulin constant regions; amplification of the myc gene has also been observed in transformed cell lines.) FIG. 1 illustrates the subclone of the mouse myc gene which provided the myc regions.

The required MMTV functions were provided by the pA9 plasmid (FIG. 2) that demonstrated hormone inducibility of the p21 protein: this plasmid is described in Huang et al. (1981) Cell 27, 245. The MMTV functions on pA9 include the region required for glucocorticoid control, the MMTV promoter, and the cap site.

The above plasmids were used to construct the four fusion gene contructions illustrated in FIGS. 3–6. The constructions were made by deleting from pA9 the Sma-EcoRI region that included the P21 protein coding sequences, and replacing it with the four myc regions shown in the Figures. Procedures were the conventional techniques described in Maniatis et al. (1982) Molecular Cloning: A Laboratory Manual (Cold Spring Harbor Laboratory). The restriction sites shown in FIG. 1 are StuI (St), SmaI (Sm), EcoRI (R), HindIII (H), PvuI (P), BamHI (B), XbaI (X), and ClaI (C). The solid arrows below the constructions represent the promoter in the MMTV LTR and in the myc gene. The size (in Kb) of the major fragment, produced by digestion with BamHI and ClaI, that will hybridize to the myc probe, is shown for each construction.

MMTV-H3 myc (FIG. 5) was constructed in two steps: Firstly, the 4.7 Kb Hind III myc fragment which contains most of the myc sequences was made blunt with Klenow polymerase and ligated to the pA9 SmaI-EcoRI vector that had been similarly treated. This construction is missing the normal 3' end of the myc gene. In order to introduce the 3' end of the myc gene, the PvuI-PvuI fragment extending from the middle of the first myc intron to the pBR322 PvuI site in the truncated MMTV-H3 myc was replaced by the related PvuI-PvuI fragment from the mouse myc subclone.

The MMTV-Xba myc construction (FIG. 3) was produced by first digesting the MMTV-Sma myc plasmid with SmaI and XbaI. The XbaI end was then made blunt with Klenow polymerase and the linear molecule recircularized with T4 DNA ligase. The MMTV-Stu myc (FIG. 6) and the MMTV-Sma myc (FIG. 4) constructions were formed by replacing the P21 protein coding sequences with, respectively, the StuI-EcoRI or SmaI-EcoRI myc fragments (the EcoRI site is within the pBR322 sequences of the myc subclone). As shown in FIG. 1, there is only one StuI site within the myc gene. As there is more than one SmaI site within the myc gene (FIG. 4), a partial SmaI digestion was carried out to

5,925,803

**5**

generate a number of MMTV-Sma myc plasmids; the plasmid illustrated in FIG. 4 was selected as not showing rearrangements and also including a sufficiently long region 5' of the myc promoter (approximately 1 Kb) to include myc proximal controlling regions.

The constructions of FIGS. 4 and 6 contain the two promoters naturally preceding the unactivated myc gene. The contruction of FIG. 5 has lost both myc promoters but retains the cap site of the shorter transcript. The construction of FIG. 3 does not include the first myc exon but does include the entire protein coding sequence. The 3' end of the myc sequence in all of the illustrated constructions is located at the HindIII site approximately 1 kb 3' to the myc polyA addition site.

These constructions were all checked by multiple restriction enzyme digestions and were free of detectable rearrangements.

Production of Transgenic Mice Containing MMTV-myc Fusions

The above MMTV-myc plasmids were digested with SalI and EcoRI (each of which cleaves once within the pBR322 sequence) and separately injected into the male pronuclei of fertilized one-cell mouse eggs; this resulted in about 500 copies of linearized plasmid per pronucleus. The injected eggs were then transferred to pseudo-pregnant foster females as described in Wagner et al. (1981) P.N.A.S. U.S.A. 78, 5016. The eggs were derived from a CD-1 X C57B1/6J mating. Mice were obtained from the Charles River Laboratories (CD$^R$-1-Ha/Icr (CD-1), an albino outbred mouse) and Jackson Laboratories (C57B1/6J), and were housed in an environmentally controlled facility maintained on a 10 hour dark: 14 hour light cycle. The eggs in the foster females were allowed to develop to term.

Analysis of Transgenic Mice

At four weeks of age, each pup born was analyzed using DNA taken from the tail in a Southern hybridization, using a $^{32}$P DNA probe (labeled by nick-translation). In each case, DNA from the tail was digested with BamHI and ClaI and probed with the $^{32}$P-labeled BamHI/HindIII probe from the normal myc gene (FIG. 1).

The DNA for analysis was extracted from 0.1–1.5 cm sections of tail, by the method described in Davis et al. (1980) in Methods in Enzymology, Grossman et al., eds., 65, 404, except that one chloroform extraction was performed prior to ethanol precipitation. The resulting nucleic acid pellet was washed once in 80% ethanol, dried, and resuspended in 300 μl of 1.0 mM Tris, pH 7.4, 0.1 mM EDTA.

Ten μl of the tail DNA preparation (approximately 10 μg DNA) were digested to completion, electrophoresed through 0.8% agarose gels, and transferred to nitrocellulose, as described in Southern (1975) J. Mol. Biol. 98, 503. Filters were hybridized overnight to probes in the presence of 10% dextran sulfate and washed twice in 2 X SSC, 0.1% SDS at room temperature and four times in 0.1 X SSC. 0.1% SDS at 64° C.

The Southern hybridizations indicated that ten founder mice had retained an injected MMTV-myc fusion. Two founder animals had integrated the myc gene at two different loci, yielding two genetically distinct lines of transgenic mice. Another mouse yielded two polymorphic forms of the integrated myc gene and thus yielded two genetically distinct offspring, each of which carried a different polymorphic form of the gene. Thus, the 10 founder animals yielded 13 lines of transgenic offspring.

The founder animals were mated to uninjected animals and DNA of the resulting thirteen lines of transgenic offspring analyzed; this analysis indicated that in every case the

**6**

injected genes were transmitted through the germline. Eleven of the thirteen lines also expressed the newly acquired MMTV-myc genes in at least one somatic tissue; the tissue in which expression was most prevelant was salivary gland.

Transcription of the newly acquired genes in tissues was determined by extracting RNA from the tissues and assaying the RNA in an S1 nuclease protection procedure, as follows. The excised tissue was rinsed in 5.0 ml cold Hank's buffered saline and total RNA was isolated by the method of Chrigwin et al. (1979) Biochemistry 18, 5294, using the CsCl gradient modification. RNA pellets were washed twice by reprecipitation in ethanol and quantitated by absorbance at 260 nm. An appropriate single stranded, uniformly labeled DNA probe was prepared as described by Ley et al. (1982) PNAS USA 79, 4775. To test for transcription of the MMTV-Stu myc fusion FIG. 6, for example, the probe illustrated in FIG. 7 was used. This probe extends from a SmaI site 5' to the first myc exon to an SstI site at the 3' end of the first myc exon. Transcription from the endogenous myc promoters will produce RNA that will protect fragments of the probe 353 and 520 base pairs long; transcription from the MMTV promoter will completely protect the probe and be revealed as a band 942 base pairs long, in the following hybridization procedure.

Labelled, single-stranded probe fragments were isolated on 8M urea 5% acrylamide gels, electroeluted, and hybridized to total RNA in a modification of the procedure of Berk et al. (1977) Cell 12, 721. The hybridization mixture contained 50,000 cpm to 100,000 cpm of probe (SA=10$^8$ cpm/μg), 10 μg total cellular RNA, 75% formamide, 500 mM NaCl, 20 mM Tris pH 7.5, 1 mM EDTA, as described in Battey et al. (1983) Cell 34, 779. Hybridization temperatures were varied according to the GC content in the region of the probe expected to hybridize to mRNA. The hybridizations were terminated by the addition of 1500 units of S1 nuclease (Boehringer Mannheim). S1 nuclease digestions were carried out at 37° C. for 1 hour. The samples were then ethanol-precipitated and electrophoresed on thin 8M urea 5% acrylamide gels.

Northern hybridization analysis was also carried out, as follows. Total RNA was electrophoresed through 1% formaldehyde 0.8% agarose gels, blotted to nitrocellulose filters (Lehrach et al. (1979) Biochemistry 16, 4743), and hybridized to nick-translated probes as described in Taub et al. (1982) PNAS USA 79, 7837. The tissues analyzed were thymus, pancreas, spleen, kidney, testes, liver, heart, lung, skeletal muscle, brain, salivary gland, and preputial gland.

Both lines of mice which had integrated and were transmitting to the next generation the MMTV-Stu myc fusion (FIG. 6) exhibited transcription of the fusion in salivary gland, but in no other tissue.

One of two lines of mice found to carry the MMTV-Sma myc fusion (FIG. 4) expressed the gene fusion in all tissues examined, with the level of expression being particularly high in salivary gland. The other line expressed the gene fusion only in salivary gland, spleen, testes, lung, brain, and preputial gland.

Four lines of mice carried the MMTV-H3 myc fusion (FIG. 5). In one, the fusion was transcribed in testes, lung, salivary gland, and brain; in a second, the fusion was transcribed only in salivary gland; in a third, the fusion was transcribed in none of the somatic tissues tested; and in a fourth, the fusion was transcribed in salivary gland and intestinal tissue.

In two mouses lines found to carry the MMTV-Xba myc fusion, the fusion was transcribed in testes and salivary gland.

5,925,803

7

RSV-myc Fused Genes

Referring to FIG. **8**, the plasmid designated RSV-S107 was generated by inserting the EcoRI fragment of the S107 plasmacytoma myc gene, (Kirsch et al. (1981) Nature 293, 585) into a derivative of the Rous Sarcoma Virus (RSV) enhancer-containing plasmid (pRSVcat) described in Gorman et al. (1982) PNAS USA 79, 6777, at the EcoRI site 3' to the RSV enhancer sequence, using standard recombinant DNA techniques. All chloramphenicol acetyl transferase and SV40 sequences are replaced in this vector by the myc gene: the RSV promoter sequence is deleted when the EcoRI fragments are replaced, leaving the RSV enhancer otherwise intact. The original translocation of the myc gene in the S107 plasmacytoma deleted the two normal myc promoters as well as a major portion of the untranslated first myc exon, and juxtaposed, 5' to 5', the truncated myc gene next to the a immunoglobulin heavy chain switch sequence.

The illustrated (FIG. **8**) regions of plasmid RSV-S107 are: crosshatched, RSV sequences; fine-hatched, immunoglobulin a coding sequences: left-hatched, immunoglobulin alpha switch sequences; right-hatched, myc exons. The thin lines flanking the RSV-S107 myc exon represent pBR322 sequences. The marked restriction sites are: R, EcoRI: X, XbaI; P, Pst 1: K, Kpn 1: H, HindIII; B, BamHI. The sequences used for three probes used in assays described herein (C-$\alpha$, $\alpha$-sw and c-myc) are marked.

Production of Transgenic Mice

Approximately 500 copies of the RSV-S107 myc plasmid (linearized at the unique Kpn-1 site 3' to the myc gene) were injected into the male pronucleus of eggs derived from a C57BL/6J×CD-1 mating. Mice were obtained from Charles River Laboratories (CD-1, an albino outbred mouse) and from Jackson Laboratories (C57BL/6J). These injected eggs were transferred into pseudopregnant foster females, allowed to develop to term, and at four weeks of age the animals born were tested for retention of the injected sequences by Southern blot analysis of DNA extracted from the tail, as described above. Of 28 mice analyzed, two males were found to have retained the new genes and both subsequently transmitted these sequences through the germline in a ratio consistent with Mendelian inheritance of single locus.

First generation transgenic offspring of each of these founder males were analyzed for expression of the rearranged myc genes by assaying RNA extracted from the major internal tissues and organs in an S1 nuclease protection assay, as described above. The hearts of the offspring of one line showed aberrant myc expression; the other 13 tissues did not.

Backcrossing (to C57B1/6J) and in-breeding matings produced some transgenic mice which did not demonstrate the same restriction site patterns on Southern blot analysis as either their transgenic siblings or their parents. In the first generation progeny derived from a mating between the founder male and C57BL/6J females, 34 F1 animals were analyzed and of these, 19 inherited the newly introduced gene, a result consistent with the founder being a heterozygote at one locus. However, of the 19 transgenic mice analyzed, there were three qualitatively different patterns with respect to the more minor myc hybridizing fragments.

In order to test the possibility that these heterogenous genotypes arose as a consequence of multiple insertions and/or germline mosaicism in the founder, two F1 mice (one carrying the 7.8 and 12 Kb BamHI bands, and the other carrying only the 7.8 Kb BamHI band) were mated and the F2 animals analyzed. One male born to the mating of these two appeared to have sufficient copies of the RSV-S107 myc

8

gene to be considered as a candidate for having inherited the two loalleles; this male was backcrossed with a wild-type female. All 23 of 23 backcross offspring analyzed inherited the RSV-S107 myc genes, strongly suggesting that the F2 male mouse had inherited two alleles at one locus. Further, as expected, the high molecular weight fragment (12 Kb) segregated as a single allele.

To determine whether, in addition to the polymorphisms arising at the DNA level, the level of aberrant myc expression was also altered, heart mRNA was analyzed in eight animals derived from the mating of the above double heterozygote to a wild-type female. All eight exhibited elevated myc mRNA, with the amount appearing to vary between animals; the lower levels of expression segregated with the presence of the 12 Kb myc hybridizing band. The level of myc mRNA in the hearts of transgenic mice in a second backcross generation also varied. An F1 female was backcrossed to a C57B1/6J male to produce a litter of seven pups, six of which inherited the RSV-S107 myc genes. All seven of these mice were analyzed for expression. Three of the six transgenic mice had elevated levels of myc mRNA in the hearts whereas in the other three the level of myc mRNA in the hearts was indistinguishable from the one mouse that did not carry the RSV-S107 myc gene. This result suggests that in addition to the one polymorphic RSV-S107 myc locus from which high levels of heart-restricted myc mRNA were transcribed, there may have been another segregating RSV-S107 myc locus that was transcriptionally silent.

Carcinogenicity Testing

The animals of the invention can be used to test a material suspected of being a carcinogen, as follows. If the animals are to be used to test materials thought to be only weakly carcinogenic, the transgenic mice most susceptible to developing tumors are selected, by exposing the mice to a low dosage of a known carcinogen and selecting those which first develop tumors. The selected animals and their descendants are used as test animals by exposing them to the material suspected of being a carcinogen and determining neoplastic growth as an indicator of carcinogenicity. Less sensitive animals are used to test more strongly carcinogenic materials. Animals of the desired sensitivity can be selected by varying the type and concentration of known carcinogen used in the selection process. When extreme sensitivity is desired, the selected test mice can consist of those which spontaneously develop tumors.

Testing for Cancer Protection

The animals of the invention can be used to test materials for the ability to confer protection against the development of neoplasms. An animal is treated with the material, in parallel with an untreated control transgenic animal. A comparatively lower incidence of neoplasm development in the treated animal is detected as an indication of protection.

Tissue Culture

The transgenic animals of the invention can be used as a source of cells for cell culture. Tissues of transgenic mice are analyzed for the presence of the activated oncogene, either by directly analyzing DNA or RNA, or by assaying the tissue for the protein expressed by the gene. Cells of tissues carrying the gene can be cultured, using standard tissue culture techniques, and used. e.g., to study the functioning of cells from normally difficult to culture tissues such as heart tissue.

A36

5,925,803

**9**

Deposits

Plasmids bearing the fusion genes shown in FIGS. **3**, **4**, **5**, **6**, and **8** have been deposited in the American Type Culture Collection, Rockville, Md. and given, respectively, ATCC Accession Nos. and

### OTHER EMBODIMENTS

Other embodiments are within the following claims. For example, any species of transgenic animal can be employed. In some circumstances, for instance, it may be desirable to use a species, e.g., a primate such as the rhesus monkey, which is evolutionarily closer to humans than mice.

We claim:

**1**. A method of testing a material suspected of being a carcinogen, comprising exposing a transgenic mouse to said material and detecting neoplasms as an indication of carcinogenicity, wherein the germ cells and somatic cells of said mouse contain an activated oncogene sequence introduced into said mouse, or an ancestor of said mouse, at an embryonic stage.

**10**

**2**. A method of testing a material suspected of conferring protection against the development of neoplasms, said method comprising

(1) providing a first and a second transgenic mouse, the germ cells and somatic cells of which contain an activated oncogene sequence introduced into said mice, or an ancestor of said mice, at an embryonic stage,

(2) treating said first mouse with said material, and

(3) detecting, as an indication of said protection, a reduced incidence of development of neoplasms in said first mouse, compared to the incidence in said second mouse, which is not so treated.

**3**. The method of claim **1**, further comprising exposing said first and second mice to a carcinogen prior to, after, or simultaneously with treating said first mouse with said material.

\*  \*  \*  \*  \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.       : 5,925,803
APPLICATION NO.   : 07/750518
DATED           : July 20, 1999
INVENTOR(S)     : Leder et al.

Page 1 of 1

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

     Column 10, line 13, replace "1" with --2--.

Signed and Sealed this
Eighth Day of February, 2011

David J. Kappos
*Director of the United States Patent and Trademark Office*

**A38**

US005925803C1

## (12) EX PARTE REEXAMINATION CERTIFICATE (8325th)

# United States Patent

**Leder et al.**

(10) **Number:** US 5,925,803 C1

(45) **Certificate Issued:** Jun. 14, 2011

(54) **TESTING METHOD USING TRANSGENIC MICE EXPRESSING AN ONCOGENE**

(76) Inventors: **Philip Leder**, Chestnut Hill, MA (US); **Timothy A. Stewart**, San Francisco, CA (US)

**Reexamination Request:**
No. 90/010,955, Apr. 20, 2010

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **5,925,803** |
| Issued: | **Jul. 20, 1999** |
| Appl. No.: | **07/750,518** |
| Filed: | **Sep. 19, 1991** |

Certificate of Correction issued Feb. 8, 2011.

**Related U.S. Application Data**

(63) Continuation of application No. 07/171,806, filed on Mar. 22, 1988, now Pat. No. 5,087,571.

(51) **Int. Cl.**
*G01N 33/00* (2006.01)

(52) **U.S. Cl.** ................................ **800/3**; 800/10; 800/18; 424/9.2

(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,360,510 A | 11/1982 | Proctor |
| 4,736,866 A | 4/1988 | Leder et al. |

OTHER PUBLICATIONS

Brinster et al., "Transgenic mice harboring SV40 T–antigen genes develop characteristic brain tumors," *Cell*, 37:367–79, 1984.

Interlocutory Decision in Opposition Proceedings (Articles 102(3) and 106(3) EPC) for European Patent Application No. 85304490.7, Jan. 16, 2003.

Jaenisch and Mintz, "Simian virus 40 DNA sequences in DNA of healthy adult mice derived from preimplantation blastocysts injected with viral DNA," *Pro. Natl. Acad. Sci. USA*, 71:1250–4, 1974.

Leder et al., "Translocations among antibody genes in human cancer," *Science*, 222:765–71, 1983.

Minutes of the Oral Proceedings for European Patent Application No. 85304490.7 and Annex 4 of the Minutes, Nov. 24, 1995.

Office Action for Canadian Patent Application No. 484,723, Feb. 21, 1990.

Office Action for Canadian Patent Application No. 484,723, Jan. 14, 1992.

Reply to Office Action for Canadian Patent Application No. 484,723, Aug. 16, 1990.

Reply to Office Action for Canadian Patent Application No. 484,723, Jul. 14, 1992.

Translation of Notice of Reason for Rejection for Japanese Patent Application No. 60–134452, Aug. 13, 1992.

Ward et al., Toxicol., Appl. Pharmacol., 51:389–397 (1979).

Schach et al., Fund. Appl. Toxicol., 3:631–639 (1983).

Schwab et al., EPA–600/9–82–013, Sym: Carcinogen, Polynucl. Aromat. Hydrocarbons Mar. Environ., 212–32 (1982).

Jaenisch et al., PNAS, USA, 71(4):1250–1254 (1974).

*Primary Examiner*—Brenda Brumback

(57) **ABSTRACT**

A transgenic non-human eukaryotic animal whose germ cells and somatic cells contain an activated oncogene sequence introduced into the animal, or an ancestor of the animal, at an embryonic stage.

US 5,925,803 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE
# ISSUED UNDER 35 U.S.C. 307

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

**2**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **1**, **2** and **3** is confirmed.

\* \* \* \* \*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing Brief of Plaintiffs-

Appellants using the Court's CM/ECF filing system. Counsel registered with the

CM/ECF system were served by operation of the Court's CM/ECF system per Fed.

R. App. P. 25 and Fed. Cir. R. 25(c) on January 6, 2014.

> Dennis C. Barghaan, Jr., Esq.
> U.S. Attorney's Office
> 2100 Jamieson Avenue
> Alexandria, VA 22314
> Dennis.barghaan@usdoj.gov

 

 

                                              /s/ Kay Wylie

## CERTIFICATE OF COMPLIANCE

I certify that the Brief for Defendants-Appellants contains 9,767 words as

measured by the word processing software used to prepare this brief.

January 6, 2014                   Respectfully submitted,

/s/ Christopher B. Mead          /s/ Donald R. Dunner
Christopher B. Mead              Donald R. Dunner
London & Mead                   Ronald A. Bleeker
1225 19th Street, NW            Andrew J. Vance
Suite 320                       FINNEGAN, HENDERSON, FARABOW,
Washington, DC  20009              GARRETT & DUNNER, L.L.P.
(202) 331-3334                  901 New York Avenue, NW
                                Washington, DC  20001
*Attorney for Plaintiff-Appellant*   (202) 408-4000
*President and Fellows of Harvard*
*College*                       *Attorneys for Plaintiff-Appellant*
                                *E. I. du Pont de Nemours and Company*